THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LAFAY-
ETTE MCNATT, Also Known as LAFAYETTE ALEXANDER, Ap-
pellant.

First Department, February 7, 1985

## APPEARANCES OF COUNSEL

*Bobette M. Masson* of counsel (*William E. Hellerstein,* attorney), for appellant.

*Jeffrey Scott Sarokin* of counsel (*Mark Dwyer* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

Defendant pleaded guilty to attempted criminal possession of stolen property in the first degree and was sentenced to a one-year term of incarceration, which he has served. He challenges the propriety of Trial Term's denial of his motion to suppress the 228 stolen New York Yankee season tickets (four complete sets), valued in excess of $1,500, that were the subject of the charge to which he pleaded.

The only witness at the suppression hearing was Police Officer Sanguiolo, a nine-year veteran of the New York City Police Department. He testified that at approximately 12:30 A.M., on May 9, 1982, while assigned to motor patrol in the 28th Precinct, he responded to a radio communication of a man with a gun wearing a brown jacket on the corner of 121st Street and Seventh Avenue. When he arrived at that intersection Officer Sanguiolo, in full uniform, exited his vehicle and spoke, first with a woman, and then with a man sitting in front of 2027 Seventh Avenue.

Officer Sanguiolo was familiar with the area. He knew, for instance, that the building at 2027 Seventh Avenue, a hotel, had recently been damaged by fire, and that a social club, known for its drug activity, was situated on the ground floor. In fact, of the hundreds of narcotics arrests which Officer Sanguiolo had made in the 28th Precinct, approximately a dozen were made in the immediate vicinity of this building, some within and some outside the social club. In a few of the officer's arrests, the narcotics were packaged in white envelopes.

About 15 minutes after his arrival at the intersection, while he was still looking for the man described in the radio report,

Officer Sanguiolo observed defendant exit the door on the left side of the vestibule at 2027 Seventh Avenue, which was the entrance to the social club. At the time, Officer Sanguiolo was approximately five feet in front of defendant, at whom he was looking directly. Defendant was holding a packet of three- by six-inch white envelopes in one hand and a black plastic bag in the other. When he looked up and saw Officer Sanguiolo, defendant, startled, jumped back, and immediately placed the stack of white envelopes in the plastic bag. Officer Sanguiolo then approached defendant and asked him what he had put in the bag. Defendant replied, "I put nothing in the bag." It was apparent to Officer Sanguiolo, however, that something was in the bag since the bottom was pressed downward. The officer told defendant that he had seen him put a stack of envelopes in the bag, but defendant insisted, "I didn't put anything in the bag."

The officer then asked defendant to open the bag. When defendant, instead of complying, hung his head, Officer Sanguiolo opened the bag, looked inside, and saw several stacks of white envelopes, later determined to number 57 in all, with the words "New York Yankee Season Tickets" printed on the front. Defendant began to breathe heavily. His hands began to shake. Officer Sanguiolo asked him where he had gotten the tickets, and he replied that he had found the bag in a lot. When the officer said "I don't believe you," defendant replied, "Well, a friend gave me the tickets and asked me whether or not I could sell them and we could make some money." At this point Officer Sanguiolo placed defendant under arrest.

Finding that Officer Sanguiolo was justified in approaching defendant and making his initial inquiry, which, not being custodial in nature, did not require the giving of the *Miranda* warnings (384 US 436), Trial Term denied defendant's motion to suppress the statements made by him before the officer opened the plastic bag. The court also refused to suppress the tickets because defendant's obviously false answers to Officer Sanguiolo's questions, coupled with the officer's on-the-scene observations, provided a sufficient predicate for opening the bag. The court did, however, suppress the statements made after the officer opened the bag because it found that once the bag had been opened defendant was in custody and should have been advised of his constitutional rights.

In evaluating the propriety of a police officer's actions during a street encounter such as the one here involved, "[t]he crucial factor is whether * * * the police behavior can be characterized as reasonable" (*People v De Bour,* 40 NY2d 210, 217). Since we

find that Officer Sanguiolo's conduct was reasonable at every stage of the encounter, suppression of the stolen property was properly denied and, accordingly, we affirm.

Officer Sanguiolo, an experienced police officer who had spent the past six years in the 28th Precinct and made hundreds of narcotics arrests, about 12 of which were in the immediate vicinity of the social club, observed defendant, at about 1:00 A.M. on the morning in question, exit the club, known by the officer to be a location for drug activity, carrying a stack of envelopes. The officer, in uniform, further observed that when defendant saw him, he jumped back, startled, and quickly placed the envelopes inside a black plastic bag.

Given the officer's experience, the setting, both as to the time and location, in which he found himself, and defendant's response, i.e., secreting the envelopes inside the bag when he spotted the officer standing outside the social club, Officer Sanguiolo quite reasonably suspected that the envelopes contained narcotics. While it is a fact, as defendant correctly notes, that the envelopes were white, not glassine, and had not been exchanged, Officer Sanguiolo, an experienced police officer, nevertheless, had reason to be suspicious. He had previously made arrests in which the narcotics were packaged in plain white envelopes. Moreover, in assessing the reasonableness of police conduct in surveilling activity thought to be narcotics related, once possession of the incriminating package is established, the absence of an exchange of the package does not render behavior, otherwise suspicious, innocuous, if sufficient other indicia of criminality is present. (*People v Eldridge,* 103 AD2d 470). Such an exchange is not "a *sine qua non* to a finding of probable cause" (*supra,* p 472). Certainly the possession of envelopes of a type such as those herein involved, which can be used in the sale of drugs, coupled with the officer's observation of furtive conduct, gives rise to, at least, a reasonable suspicion.

Under the circumstances presented, Officer Sanguiolo was plainly duty bound to investigate. Even defendant concedes that the officer's initial approach and inquiry were justified. More importantly, though, at least for the disposition of this appeal, the manner in which the officer pursued his inquiry was eminently reasonable. At no point did he forcibly seize defendant; nor did he tell defendant that he was not free to leave. He simply approached defendant and asked him what he had put in the bag. Defendant's negative response only served to confirm the officer's initial suspicion of illicit conduct. In view of what the officer had just witnessed, defendant's denials were, on their face, absurd.

It is this circumstance which distinguishes the instant case from *People v Howard* (50 NY2d 583, *cert denied* 449 US 1023), upon which the dissent relies. Unlike *Howard* (p 590) where, despite a basis for initial inquiry, "there was nothing that made permissible any greater level of intrusion", defendant's obviously false answers generated a basis for further police action. As Trial Term aptly noted, "defendant's untruthful response to the officer's questions significantly changed the nature of the encounter." Defendant's patently false answers to Officer Sanguiolo's inquiry "afforded solid ground to look further." (*People v Rosemond,* 26 NY2d 101, 105.)

Given the circumstances and defendant's obvious falsehoods, it was both reasonable and proper for Officer Sanguiolo to focus on the contents of the bag. Eschewing a "full-blown" search, the officer, as he was duty bound to do (*see, People v Acevedo,* 88 AD2d 813, 814), pursued his investigation in the least intrusive manner possible by asking defendant to open the bag. When defendant lowered his head in response, it was obvious that further inquiry about the envelopes would be unavailing and Officer Sanguiolo opened the bag himself. Directing his attention to the envelopes, the focus of his suspicions, the officer found that they bore the legend "New York Yankee Season Tickets", certainly an incongruous discovery under the circumstances. Defendant's further response, first that he had found the tickets in a lot, and then that a friend had given him them to sell, made plain that he was not their true owner. It is undisputed that at that point Officer Sanguiolo had a sufficient basis upon which to make an arrest.

Contrary to Trial Term's ruling, defendant's responses were not the product of custodial questioning and therefore constitutionally infirm, but, rather, well within the permissible scope of legitimate noncustodial police inquiry. (*See, People v De Bour,* 40 NY2d 210, 220, *supra.*)

Police conduct similar to that which occurred here has been upheld as part of an escalating inquiry, despite the lack of probable cause. (*See, e.g., People v Cruz,* 43 NY2d 786 [officer ordered suspect to remove soda bottle from hand, revealing packet of heroin underneath]; *People v De Bour, supra,* p 213 [after noticing waist-high bulge in his jacket, officer requested suspect to unzip his jacket]; *People v Moore,* 47 NY2d 911, *revg* on dissenting opn below 62 AD2d 155, 157 [at detective's request suspect with a pillowcase slung over his shoulder like a sack permitted inspection of the sack].) And, of course, it should not make any difference for Fourth Amendment purposes whether a

suspect acquiesces in a police officer's request, made pursuant to his duty to investigate, to open a bag, or whether the officer, pursuant to that same duty, opens the bag.

In sum, every step taken by Officer Sanguiolo in this rapidly escalating street encounter was an appropriate response to a new developing circumstance, each of which more clearly pointed to criminal activity. The officer's investigation was conducted in the least intrusive manner possible. In such a case, given the circumstances, the officer is not obliged "simply [to] shrug his shoulders and allow a crime to occur or a criminal to escape." (*Adams v Williams,* 407 US 143, 145.) Neither the State nor Federal Constitution requires such a result. Officer Sanguiolo's actions, including the opening of defendant's bag to check its contents, were not only reasonable but the only appropriate steps to take under the circumstances.

Accordingly, the judgment of the Supreme Court, New York County (Neco, J.), rendered September 21, 1982, convicting defendant of attempted criminal possession of stolen property in the first degree and sentencing him to a one-year term of imprisonment should be affirmed.

MILONAS, J. (dissenting). Defendant was convicted, upon his plea of guilty, of attempted criminal possession of stolen property in the first degree and was sentenced to a one-year term of imprisonment.

This case arose out of an incident which occurred on May 9, 1982 when Police Officer Matthew Sanguiolo, who was on uniformed motor patrol, received a radio communication at approximately 12:30 A.M. advising him that a man, wearing a brown jacket, had been seen with a gun on the corner of 121st Street and Seventh Avenue. He and his partner arrived at that location shortly thereafter but did not find anyone who could have been the reported individual. They then paused to question a woman in the area and a man seated in front of 2027 Seventh Avenue, a partially gutted, semiabandoned hotel with a ground floor social club which was known for its drug activity. Although the officers failed to elicit any information from these persons, they remained on the scene.

Some 10 to 15 minutes later, the defendant was observed emerging from the social club carrying a packet of three- by six-inch white envelopes in his right hand and a black plastic bag in the other hand. When he glanced up and noted Officer Sanguiolo's presence, he purportedly jumped back with a startled look and dropped the envelopes into the bag. On cross-examination, the officer conceded that he was unable to recall whether the

shopping bag had handles or any markings or even what size it had been. He also did not remember if the defendant had been wearing a brown jacket at the time. At any rate, Officer Sanguiolo approached the defendant, inquiring as to what he had just placed in the bag. The defendant replied that he had not put anything there. The officer, unimpressed with the defendant's answer, repeated the question, and the defendant again offered a denial. Officer Sanguiolo then directed the defendant to open the bag. The latter, however, did not comply so the officer opened the bag himself and looked inside, seeing several stacks of white envelopes imprinted with the words "New York Yankee Season Tickets." The defendant became extremely nervous; he began to breathe heavily, his hands shaking. The officer asked him where he had obtained the tickets, and the defendant claimed to have discovered the bag in a lot and to have picked it up. Officer Sanguiolo expressed his disbelief as to the defendant's account. Thereupon, the defendant stated that a friend had given him the tickets to sell and that they intended to share the proceeds. At this point, the defendant was placed under arrest.

Following a hearing in connection with the defendant's motion to suppress, the court determined that based upon Officer Sanguiolo's years of experience, his testimony that the area and the social club were known for drug-related activities, the late hour of the night, and defendant's nervous behavior upon first spotting the officer, there was a sufficient predicate to make an initial noncustodial inquiry. Thereafter, the defendant's furtive, nervous behavior and his obviously false responses to the officer's questions justified the minimal intrusion involved in the examination of the bag's contents by the police. Since these contents appeared so plainly to be stolen or unexplained, the court concluded, and the defendant's story kept changing, there was probable cause for his arrest. However, the court did order the suppression of all statements made by the defendant after his arrest because of the failure to provide him with the requisite *Miranda* warnings.

In *People v Howard* (50 NY2d 583, 586), the Court of Appeals declared that: "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime. Though the police officer may endeavor to complete the interrogation, he may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions, even though he ran away."

The defendant herein was observed exiting from a building noted for drug activity. Yet, mere presence in the vicinity of a crime (which, in this instance, was highly speculative anyway), with or without envelopes in one's hand, does not, by itself, constitute probable cause such as would support either a search or an arrest. (*See, People v Monsanto,* 52 NY2d 931.) There is certainly no indication that the defendant was the person described in the radio run, and, indeed, Officer Sanguiolo never claimed that the defendant was wearing a brown jacket. Similarly, there was absolutely no reason to believe that the defendant was armed or that the shopping bag contained a weapon. Thus, when Officer Sanguiolo first approached the defendant, he and his partner possessed no information which could reasonably have led them to conclude that the defendant was engaged in any sort of criminal activity. In that regard, the law is clear that before "the police may stop a person pursuant to the common-law right to inquire there must exist at that moment a founded suspicion that criminal activity is present" (*People v De Bour,* 40 NY2d 210, 215; *see also, People v Harrison,* 57 NY2d 470; *People v Landy,* 59 NY2d 369). However, even assuming that Officer Sanguiolo was warranted in questioning the defendant, "there was nothing that made permissible any greater level of intrusion." (*People v Howard, supra,* p 590.)

The police were, under the circumstances of this case, confronted only by facts conducive to innocent interpretation. As the Court of Appeals stated in *People v De Bour* (*supra,* p 216): "We have frequently rejected the notion that behavior which is susceptible of innocent as well as culpable interpretation, will constitute probable cause * * * It is equally true that innocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand." Moreover, the defendant's supposed nervousness when he sighted the officers was, at most, ambiguous. (*See, People v Howard, supra.*) Since he had a constitutional right to decline to answer any police inquiries, Officer Sanguiolo was not authorized in using the defendant's refusal to divulge the contents of the bag as a predicate for a search. "It merits little discussion but to note that, except in a few specified categorical instances, the Fourth Amendment prohibits all searches and seizures without the prior approval of a disinterested Magistrate" (*People v De Santis,* 46 NY2d 82, 87, *cert denied* 443 US 912). None of these "few specified categorical instances" can be applied to the matter at issue here, and the People do not attempt to do so.

Instead, the People contend that the act of leaving a building which may have been the scene of drug transactions in the past,

in conjunction with the defendant's nervousness and his failure to respond truthfully to police questions (and he had a perfect right not to answer at all), provided the police with an adequate basis for a search of his shopping bag. While the People place great significance in the fact that the defendant was holding a stack of envelopes in his hand when he first came out onto the street, they were ordinary white envelopes, not glassine, and they were not being passed or exchanged. Surely, carrying plain white three- by six-inch envelopes is susceptible of innocent interpretation. These envelopes might easily have contained letters which the defendant was planning to mail, or payroll checks or any number of other items. Indeed, notwithstanding any testimony to the contrary by the arresting officer, white envelopes of the size involved here are simply not utilized as packaging for narcotics, and the possession of such envelopes is not consistent with the belief that drug-related activity is afoot.

The fact is, the officers here had no reasonable grounds to believe that the defendant had committed, or was in the process of committing, a crime until Officer Sanguiolo had already reached into the shopping bag and retrieved the envelopes bearing the words "New York Yankee Season Tickets". However, it is almost too evident to necessitate mention that a search illegal at its inception cannot be validated by what it produces. (*See, People v De Bour, supra.*) Consequently, the defendant's motion to suppress the physical evidence should have been granted.

KUPFERMAN, J. P., and KASSAL, J., concur with SULLIVAN, J.; FEIN and MILONAS, JJ., dissent in an opinion by MILONAS, J.

Judgment, Supreme Court, New York County, rendered on September 21, 1982, affirmed.