THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RUDY CORNELIUS, Appellant.

First Department, January 7, 1986

## APPEARANCES OF COUNSEL

*Murray E. Singer* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Gino A. Zonghetti* of counsel *(Mark Dwyer* and *Doris Lukaszuk* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

FEIN, J.

This is another case arising out of police-citizen encounters in which the duty of the police to make the streets reasonably safe for us all must be balanced against the indisputable right of the individual to be free from arbitrary and unwarranted police intrusion, which is one of the cornerstones of our free society.

Defendant, who stands convicted of the crime of criminal possession of a weapon in the third degree, upon his plea of guilty, appeals from the order denying his motion to suppress the gun seized by the police during a search of his pocket.

Plain-clothes policemen cruising in an unmarked vehicle in Harlem at about 10:00 P.M. on a spring evening saw defendant "walking on 120th Street * * * He was stopping and going. Walking and stopping. Looking around. Looking behind. Looking across the street. Down the block * * * He wasn't doing anything wrong except he was a little out of the ordinary." Defendant was alone.

When asked why he considered such conduct to be "out of the ordinary", the arresting officer responded, "The average person just walks and goes about their business. They don't do what he was doing." The officer agreed, however, that defendant may have thought he was being followed, or was looking for someone.

Defendant was wearing "a beige three-quarter length raincoat. Kind of wrinkled up and dirty." The officer agreed that "the trench coat was pretty ragged and old".

The police slowed their car to a walking pace and followed defendant at a distance of about five car lengths. After observing him for about five seconds, they slowly pulled ahead, noting that defendant did not put his hands in his pockets, that his hands were "[o]utside his coat, walking along, they were swinging along as a person would walk along." However, his coat hung lower on the right side than the left, evidently

caused by an "object" of "bulk" and "weight" in his pocket. At this point, the police decided to stop and investigate.

Approaching defendant with his badge in hand, the testifying officer asked defendant what he had in his pocket. "Nothing", responded defendant. The officer then touched the outside of the pocket and confirmed that *something* (not yet identified) was inside. A more determined grasp revealed the outline of a gun, which was then withdrawn from defendant's pocket by the policeman. Defendant's arrest followed.

It is now settled that police action by way of frisk or search and seizure to discover whether contraband is concealed on a person must be predicated on some objective credible suspicion that points to criminal activity afoot *(People v De Bour,* 40 NY2d 210). The police simply do not have *carte blanche* to search or "touch the pocket" of every individual on the street who walks in a "little out of the ordinary" manner, looks over his shoulder, wears a "wrinkled up and dirty" "ragged and old" coat, or appears to have a bulky object in his pocket.

"We have frequently rejected the notion that behavior which is susceptible of innocent as well as culpable interpretation will constitute probable cause" for a search, or that "innocuous behavior alone will * * * generate a founded or reasonable suspicion that a crime is at hand." Such an encounter "supported by less than reasonable suspicion * * * would not justify a stop involving actual or constructive restraint." *(People v De Bour, supra,* 40 NY2d, at p 216.) There must be either describable conduct or proof of a describable object before police can probe for a concealed weapon.

Thus, in *People v Bernard* (reported with *People v Prochilo,* 41 NY2d 759, 763), which was factually quite similar to this case, the officer saw "a heavy object slide against the material in the right pocket" of the defendant's long outer coat. The officer tapped the pocket and "on feeling a hard object, reached into the pocket and removed a .22 calibre six-inch revolver with six rounds of live ammunition." Suppression was directed because the defendant "had done nothing wrong" before the officer reached into the defendant's pocket and because the officer could not tell "what the heavy object appeared to be by looking at the pocket". Nothing in the "defendant's standing behind the pimp, in his nervousness or his slouched stature, or the fact that he had his hands in his coat pockets and removed them very slowly when requested to do so, or that a heavy object slid against the material of defendant's pocket * * * can be

said to be reasonably referable to or indicative of the presence of a revolver."

The officer here initially testified that all he wanted was a reasonable answer to his query about the bulky and weighty object in defendant's pocket, and defendant then would have been free to go "on his way without my ever touching his pocket." He later added that to satisfy his own curiosity he probably still would have touched the pocket if defendant had not shown him its contents. Such a touch would have been an unwarranted intrusion *(see, People v Sanchez,* 38 NY2d 72).

The fact that defendant's " 'pocket was hanging', 'like something heavy was in it' " was held insufficient as a basis for a frisk or search for a revolver in *People v Williams* (79 AD2d 147, 151). "[A] pocket bulge [can] be caused by any number of innocuous objects" *(People v De Bour,* 40 NY2d, at p 221). On the facts here, it is plain there was no lawful predicate for the search.

With no inkling that criminal activity was afoot *(cf.* CPL 140.50 [1]), there was no articulable reason for the police even to have questioned this defendant about the contents of his pockets. Accordingly, defendant's response of "nothing" was equivalent to his right not to respond at all *(see, People v Howard,* 50 NY2d 583, 586). Nothing in defendant's response "made permissible any greater level of intrusion" *(supra,* at p 590). It certainly did not warrant a pat down of defendant's pocket. Whatever "fear for their safety" the police may have felt as an immediate predicate for their subsequent search for a gun *(see,* CPL 140.50 [3]) was solely a result of an unwarranted intrusion in the first place.

*People v Benjamin* (51 NY2d 267), relied on by the dissent, is plainly distinguishable. In that case two plain-clothes police officers received a radio run to the effect that men with guns were at a designated location. Upon arriving at the scene, the officers observed approximately 30 people. As the officers walked through the group and while they were approximately 10 feet from Benjamin, he stepped backward toward the curb and reached underneath his jacket to the rear of his trouser waistband. A limited pat down of Benjamin yielded a loaded gun. The information in the possession of the officers that men with guns were present and their observation of the defendant's behavior gave rise to a reasonable suspicion that he might be armed, warranting the limited intrusion which produced the loaded revolver.

Here, there was no such basis for touching or searching defendant's coat pocket. There was no suspicious conduct or activity by defendant.

The applicable law was stated in *Sibron v New York* (392 US 40, 64): "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. *Terry* v. *Ohio* [392 US 1]".

Each of the observed actions or appearances of the defendant in this case, viewed either separately or together, was plainly susceptible to interpretation as innocent behavior. Furthermore, the combining of such otherwise innocuous actions and behavior in a setting described as a "high crime area" does not expand the powers of the police to the detriment of those individuals who happen to live or work in, or are passing peaceably through, such a neighborhood.

As the Court of Appeals stated in *People v Cantor* (36 NY2d 106, 112-113), "Before a person may be stopped in a public place a police officer must have reasonable suspicion that such person is committing, has committed, or is about to commit a crime (CPL 140.50). Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand."

Nor does the fact that defendant falsely answered "nothing" in response to the officer's inquiry as to the contents of his pocket justify the search. In *People v McNatt* (65 NY2d 1046, *revg* 107 AD2d 1) the majority of this court heavily relied on the false response as justifying the search. However, as the Court of Appeals noted in reversing (65 NY2d, at p 1048), "Absent a showing of the existence of one of ' "a few specifically established and well-delineated exceptions" ' *(Schneckloth v Bustamonte, 412 US 218, 219; Katz v United States, 389 US 347, 357; People v De Santis, 46 NY2d 82, 87, cert denied 443 US 912)* to the constitutional proscription on warrantless searches, such action, undertaken without probable cause, will not be upheld."

None of these "specifically established and well-delineated

exceptions" applies in this case *(see, People v De Santis,* 46 NY2d 82, 87, *cert denied* 443 US 912, *supra).*

It may very well be possible that a random search of all passersby on the street in this particular neighborhood at this time of night would have yielded a lot of contraband. But the individual liberties in our Constitution are not based upon statistical probabilities. The constitutional protections against unwarranted intrusion by an agent of the State are not to be relaxed when an individual goes for a walk, or engages in otherwise innocent behavior, in a public area statistically known for a high incidence of crime. The 4th Amendment has never been so amended.

The testifying officer indicated that this was a "medium to high" crime area. There was a good deal of testimony and questioning as to this issue. And it was relied upon in the suppression Justice's decision. Thus, once again there emerges the danger of an elastic exception to the 4th Amendment based upon a court's acceptance of a policeman's personal estimate of the level of crime in the neighborhood. The officer named as low crime areas in the city "Staten Island, Queens, parts of Manhattan."

It cannot be doubted that certain locales in the city are appropriately designated high crime areas, based upon the statistical analyses of the law enforcement authority. The validity of the police department's use of such designations in the allocation of its limited resources is hardly open to question. However, the designation of a particular area as one with a higher than average incidence of crime does not give the police the right to go around that neighborhood touching the pockets of everyone on the street who appears a little out of the ordinary, simply because it may be obvious that the individual happens to be carrying an unidentified object in his pocket. Our respect for those brave policemen whose duty includes operating in areas known for higher than average criminal activity cannot be permitted to override the constitutional mandate that the detention of an individual on a public way, and his subsequent search for concealed contraband, must be based on more than "mere whim, caprice, or idle curiosity" *(People v Ingle,* 36 NY2d 413, 420; *People v Cantor,* 36 NY2d 106, 112-113).

In essence, what occurred was that in the face of normal, innocuous behavior the officer's response was premised upon a "hunch" or "gut reaction". Such a reaction is an insufficient

basis upon which to found a stop and seizure *(People v Sobotker,* 43 NY2d 559, 564).

As noted, the police action and the suppression Justice's determination seem to be premised, at least in part, on the fact that the incident occurred in a "medium to high" crime area. There is no warrant for concluding that the fact that the events occurred in such an area justifies a greater level of intrusion than would be warranted by the same behavior in other areas *(see, People v McRay,* 51 NY2d 594, 606 [Fuchsberg, J., concurring]; *People v Le Grand,* 110 AD2d 539, 542-545 [Fein, J., concurring]). Nor is there any warrant for premising the level of police activity on the fact that the defendant was wearing a "wrinkled up and dirty" and "ragged and old" trenchcoat. Although the incident occurred in an area not notable for affluence, this should not be the measure of the level of police intrusion.

Nor does the fact that the search yielded a gun justify the stop, search and seizure and the arrest. A search illegal at its inception cannot be validated by what it produces *(People v De Bour, supra).*

The judgment of Supreme Court, New York County (Kenneth L. Shorter, J.), rendered January 27, 1984, convicting defendant on his plea of guilty to criminal possession of a weapon in the third degree, should be reversed, on the law and the facts, and the motion to suppress physical evidence granted and the indictment dismissed.

Ross, J. (dissenting). After analyzing the facts, I find that legal authority justified the police action that was taken. Therefore, I dissent and would affirm Trial Term's denial of defendant's motion to suppress the seized .22 caliber pistol.

Almost 40 years ago, the United States Supreme Court said that: "In dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *(Brinegar v United States,* 338 US 160, 175.) Just recently, the Supreme Court continued to apply this common-sense standard in making an evaluation of the appropriateness of police conduct in a search and seizure case *(Illinois v Gates,* 462 US 213, 231). The Court of Appeals of this State has held in *People v De Bour* (40 NY2d 210, 217): "[t]he crucial factor is whether or not the police behavior can be characterized as reasonable". Moreover, former Chief Justice Warren

wrote for the majority in *Terry v Ohio* (392 US 1, 30-31): "We * * * hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken."

Based upon the teaching of these cases, I find it entirely reasonable for the police to have acted as they did, with respect to the defendant.

On the evening of May 20, 1983, at approximately 10:00 P.M., New York City Police Sergeant Daniel Cotter (Cotter) and his partner, Police Officer Patrick Gaudett, both assigned to a Street Crime Unit, were on duty in civilian clothes and patrolling in an unmarked police car.

The sergeant was a 15-year veteran of the force, who had been a supervisor for four years and who had served approximately eight years with Street Crime Units, which operated particularly in the area where the subject arrest occurred. In view of his expertise, that officer testified that this location is "a high-crime area, that is why we are assigned there. There are high incidents of street robberies, drugs, other violent street crimes".

At 120th Street, the sergeant saw the defendant walking alone. His attention was initially drawn to the defendant because of the unusual way in which the defendant was walking. Cotter testified: "He was stopping and going. Walking and stopping. Looking around. Looking behind. Looking across the street. Down the block." Furthermore, this officer testified: "[w]hen I observed him from the front, he * * * [was wearing] a raincoat, the raincoat was hanging from the right-hand side, lower than the left-hand side. And there appeared to be an object in * * * [the right-hand pocket]". In response to these observations, this experienced police officer exited the

police car. Thereupon, he went up to defendant, identified himself as a police officer, and asked the defendant what he had in his right-hand pocket.

It is hornbook law that the police have a right to approach a person on the street for the purpose of requesting information, so long as they have an articulable reason for doing so *(People v De Bour, supra,* at p 213). In the instant case, the time and place (i.e., a high crime area), coupled with defendant's out-of-the-ordinary method of walking and what appeared to be an object that had bulk and weight provided such a reason.

The majority state, at page 671 of their writing, that "[t]he constitutional protections against unwarranted intrusion by an agent of the State are not to be relaxed when an individual goes for a walk, or engages in otherwise innocent behavior, in a public area statistically known for a high incidence of crime." There is nothing in this statement that is subject to debate, except, it is not the manner in which defendant was proceeding; but rather it was the manner of defendant's movements, which first attracted the police attention. In my opinion, the majority have overlooked this important distinction.

A unanimous Court of Appeals has ruled in *People v Rosemond* (26 NY2d 101, 104): "[t]he police can and should find out about unusual situations they see * * * To a very large extent what is unusual enough to call for inquiry must rest in the professional experience of the police." The majority does not question this sergeant's qualifications as a street-wise police officer, and the Trial Justice, who conducted the suppression hearing and took the defendant's plea, found the sergeant to be "a highly credible * * * witness".

When the defendant replied that there was nothing in his pocket, the sergeant knew that the defendant was lying, since it was obvious, to see from the bulge, that there was something there. As a direct consequence of the defendant's intentionally false answer, Cotter touched the bottom of the defendant's pocket with his fingers to ensure "my own safety and the safety of my fellow officers." In pertinent part, he testified: "I touched the bottom of the pocket with my fingers. There was something in there. Then I grabbed the entire pocket from the outside, it felt like a gun to me. I stuck my hand in the pocket and took out a gun."

At every stage of this encounter between the police and the

defendant, the police actions were limited to the minimum degree of intrusion necessary. For example, neither the sergeant nor his partner ever drew their weapons nor was the defendant ever grabbed or subjected to a full frisk.

The majority contends, on page 669 of their writing, that "[w]hatever 'fear for their safety' the police may have felt as an immediate predicate for their subsequent search for a gun *(see,* CPL 140.50 [3])* was solely a result of an unwarranted intrusion in the first place", is simply not the law in this State. "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety." *(People v Benjamin,* 51 NY2d 267, 271.)

A short time ago, the Court of Appeals decided the case of *People v McNatt* (65 NY2d 1046). The *McNatt* case involved an initial stop and inquiry by the police, which produced a patently false response from a suspect. Without dissent, the court in *McNatt (supra,* p 1048), of that opinion, reaffirmed the principle of *Terry v Ohio (supra)* that an officer is entitled to make a subsequent search when he entertains "a reasonable fear that he [is] in danger of physical injury by virtue of defendant being armed".

Accordingly, Trial Term did not err in denying suppression.

CARRO and ELLERIN, JJ., concur with FEIN, J.; KUPFERMAN, J. P., and Ross, J., dissent in an opinion by Ross, J.

Judgment, Supreme Court, New York County, rendered on January 27, 1984, reversed, on the law and the facts, and the motion to suppress physical evidence is granted, and the matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of a copy of this court's order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.