THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
BIENVENIDO TAVERAS, Appellant.

First Department, March 22, 1990

APPEARANCES OF COUNSEL

*Susan H. Odessky* of counsel *(Donald J. Siewert* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Morton Katz* for appellant.

**OPINION OF THE COURT**

CARRO, J.

■ This appeal concerns whether defendant's fundamental right to be free from unlawful search and seizure was violated by the police, or, restated, whether the particular police conduct was inappropriate.[1] Under the circumstances presented herein, the correct conclusion is that the police conduct was unlawful and trampled defendant's constitutional rights.

The facts in this case are relatively simple. On October 26, 1988, Police Officers Thomas Hovagim and Wilfredo Occasio were in their RMP patrolling in the vicinity of West 172nd Street and Broadway. At 3:00 P.M., they received an anonymous tip to the effect that a man was looking into parked cars on 172nd Street. Upon turning the corner, the officers saw Cesar Reyes, who matched the description given by the infor-

---

1. We note that defendant expressly reserved his right to appeal the suppression ruling, both at the plea and sentence proceedings. *(Cf., People v Seaberg,* 74 NY2d 1, 7, 9-10 [1989]; *People v Williams,* 36 NY2d 829, 830 [1975], *cert denied* 423 US 873 [1975].)

mant, doing exactly that in front of 615 West 172nd Street. Upon asking Reyes where he lived and for identification, Reyes allegedly responded that he lived in apartment 5G of number 615. The officers testified that Reyes then invited them to accompany him to "his" apartment so that he could obtain some identification to show the officers.[2]

Reyes and the officers entered the lobby of 615 West 172nd Street. As they waited for the elevator to come, defendant Taveres came down the staircase. Hovagim testified that upon reaching the lobby, defendant "sees us. He makes a motion, like 'I forgot something.' Turns around and starts to go upstairs."

As defendant proceeded away, Reyes then supposedly said, in Spanish, to defendant, "[w]hen I ask you for Maribel upstairs, say no." Occasio translated this from Spanish to English for Hovagim. The testimony of the officers reflects, variously, no response by defendant, a parroting of the request by defendant, and different inflections and emphasis, which allegedly implied an additional conversation would be had for the benefit of the police. Suffice it to say that these comments or conversation were, at best, ambiguous and equivocal.[3]

Hovagim then turned his attention to defendant, asking him where he lived. Defendant allegedly answered that he resided in apartment 5G. When Hovagim asked defendant if he knew Reyes, defendant allegedly responded in the negative.[4] Hovagim then "asked" defendant to turn around, because he "wanted to talk to him." As defendant complied, Hovagim saw a "huge lump" in his pants, "right below the waistband to the right". Hovagim subsequently pinpointed the lump as being located between the waist and groin, *underneath* the belt area. Hovagim asserted that "[f]earing for my safety, thinking it was something that could hurt me, it looked hard, I went in and pulled it down". At no time, however, did Hovagim contend that he saw the outline of what appeared to be a weapon. Upon reaching inside the front of defendant's pants, Hovagim retrieved a plastic bag containing approximately 10 ounces of cocaine.

Defendant was placed under arrest. Shortly thereafter, as

---

2. At no time was Reyes arrested on the date in question.

3. Indeed, this is underscored by the fact that the officers refer to "Mirabel", while the defense witnesses refer to a person called "Milagros".

4. It is noteworthy that at the hearing, Reyes testified that he lived not at 615 West 172nd Street, but at 181st Street and Bennett Avenue.

the officers brought him to the RMP he allegedly blurted out, before *Miranda* warnings could be administered, "I don't buy or sell crack. I'm—I mean, I don't buy crack or smoke crack or sell it. I'm just paid to transport it."

The defense also presented evidence at the hearing. Cesar Reyes testified that he went to the subject building to wait for his brother to pick him up. While waiting, he was approached by Hovagim and Occasio, who asked him what he was doing there. Reyes responded that he was waiting for his brother and visiting the brother's girlfriend, Milagros. He further asserted that he then told the officer that Milagros resided in apartment 5G. Reyes testified that the officers searched him immediately and proceeded to bring him into the building to go to apartment 5G, although he said that Milagros was not home.

Reyes recalled that at this point, defendant either came down the stairs or the elevator and entered the lobby. Reyes inquired whether Milagros was home. He could not recall whether defendant responded, but remembered that the officers suddenly forced both defendant and himself to lean against the wall, whereupon they were searched.

In the course of this search Corin Sanchez entered the building; she too, was going to visit Milagros. Both Sanchez and Reyes testified that upon learning this, the officers searched her bag and ordered her to empty her pockets. Reyes and Sanchez also testified that upon a further search of defendant, one of the officers stated that he felt "something", immediately unbuckled defendant's belt, reached inside his pants and pulled a bag from defendant's groin. Reyes and Sanchez were released following defendant's immediate arrest.

The hearing court fully credited the testimony of the officers in all respects. This was in sharp contrast to its determination concerning the testimony of Reyes and Sanchez, which it found to be incredible and tailored. As to Reyes, the court ruled that under the circumstances presented, the officers had a common-law right to inquire. While the court acknowledged that when defendant entered the lobby, there was "no conduct indicative of criminality" and "obviously * * * no reason to stop him", it stated that once Reyes made the statement regarding Mirabel, "[y]ou have basically an escalating situation". The court went on to determine that because defendant denied knowing Reyes, even while they both appeared to either live in or be visiting 5G was sufficient for "a little bit of a higher level of suspicion [to] now [be] aroused".

The court then determined that once defendant turned around and Hovagim observed the bulge in defendant's crotch, it was minimally intrusive for him to reach out and touch defendant. The court found that once the hard object was felt, "[Hovagim was] obviously * * * in fear at this point" and concerned for his safety, and entitled to remove the object, the bag containing the drugs. Indeed, the court held that probable cause existed at that moment and that the search was lawful. The court further ruled that defendant's statement was spontaneously volunteered. Accordingly, it denied defendant's motion to suppress in its entirety.

On appeal, defendant contends that the officer lacked reasonable suspicion that defendant was engaging in any criminal activity when he searched the groin of defendant's pants and seized the plastic bag containing the cocaine. We agree and, accordingly, reverse, suppress the physical evidence consisting of the cocaine, as well as defendant's postarrest statement, and dismiss the indictment.

It is well settled that the police have a common-law right to inquire, which "is activated by a founded suspicion that criminal activity is afoot"; the purpose of this limited inquiry is to either confirm or refute that suspicion. *(People v De Bour,* 40 NY2d 210, 223 [1976]; *People v Cornelius,* 113 AD2d 666, 669-670 [1st Dept 1986].)* A founded suspicion of criminal activity arises only when there is an articulated and "present indication of criminality based on observable conduct or reliable hearsay information." *(People v Boulware,* 130 AD2d 370, 373 [1st Dept 1987], *appeal dismissed* 70 NY2d 994 [1988].)* Before a person may be stopped in a public place, however, the police must have a reasonable suspicion that the person is committing, has committed, or is about to commit a crime. *(Terry v Ohio,* 392 US 1, 21-22 [1968]; *People v De Bour, supra,* 40 NY2d, at 223; *People v Cantor,* 36 NY2d 106, 110-111 [1975]; CPL 140.50.)*

In considering whether there is a reasonable suspicion, it is of paramount importance to keep in mind what reasonable suspicion is not. An officer's conduct, based upon a vague or unparticularized hunch does not meet this standard. *(People v Sobotker,* 43 NY2d 559, 564 [1978]; *People v Howard,* 147 AD2d 177, 179 [1989], *appeal granted* 74 NY2d 822 [1989]; *People v Cornelius, supra,* 113 AD2d, at 671.)* Neither does innocuous, or even equivocal behavior generate a founded or reasonable suspicion that a crime is at hand. *(People v De*

*Bour, supra,* 40 NY2d, at 216; *People v Meachem,* 115 AD2d 370, 372 [1st Dept 1985]; *lv denied* 67 NY2d 763 [1986].)

In the instant case, defendant's conduct prior to the stop, which occurred when he was ordered to turn around, was clearly innocuous. The events prior to the stop, while perhaps indicating that criminal activity may have been afoot, regarded activity *outside* the building, by Reyes, not defendant. The police, responding to an anonymous tip that a man outside the building was, in essence, casing parked cars, had absolutely no reason to believe that anything was going on *inside* the building. Moreover, by virtue of the fact that when they arrived they found Reyes gazing at the cars, the officers had their suspect, if one was to be had.

Thus, defendant's involvement in any occurring or imminent criminal transaction obviously cannot be traced to the events outside the building. We find it distressing to think that by merely coming down the elevator, or staircase, into a public, common lobby area of a large apartment building, a man could be subject to police action. As to the fact that defendant began to start back upstairs when he saw Reyes and the police, the police witness testimony was unwavering that this appeared to be because he had forgotten something, rather than because he was beating a hasty retreat. While there may be a claim, and indeed the People do assert, that Reyes' subsequent comment with regard to Mirabel (the name used during the testimony of the officers) or Milagros (the name used during the testimony of Reyes and Sanchez) was of moment, we do not find it to have heightened suspicion with regard to any conduct or activity on the part of defendant.

Thus, we find that defendant's conduct, which was of a totally innocuous nature, coupled with Reyes' statement would not constitute a founded suspicion that there was any criminal activity afoot, which would be the necessary predicate for the variety of limited interference, short of a seizure, incidental to the common-law right of inquiry. *(People v Howard, supra,* 147 AD2d, at 180, citing *People v Carrasquillo,* 54 NY2d 248, 252.)

■ Even assuming, arguendo, that the officers were entitled to inquire of defendant, and giving full credit to their testimony in that regard, Hovagim's authoritative act of ordering defendant to turn around, with which defendant immediately complied, constituted a forcible seizure. *(See, People v Howard,*

*supra,* 147 AD2d, at 180.)[5] In fact, we believe defendant should have been entitled to walk away and not respond to the officers at all. *(See, People v Howard,* 50 NY2d 583, 586 [1980], *cert denied* 449 US 1023 [1980]; *People v Cornelius, supra,* 113 AD2d, at 669.)

Furthermore, had the officers been entitled to proceed this far, there is still no justification for Hovagim's search of defendant's groin. There is much law regarding the so-called "bulge" cases, which, when juxtaposed with the facts herein, underscore the impropriety of the search.

Waistband bulges are considered to be indicative of a weapon. *(People v De Bour, supra,* 40 NY2d, at 221 [we note that in *De Bour,* the officer first inquired as to the nature of the waistband bulge prior to conducting the search, in sharp contrast to the case herein, where, as the hearing court observed, defendant found the officer's hand down his crotch in short order]; *People v Benjamin,* 51 NY2d 267, 269, 271 [1980].) Undefinable pocket bulges are not considered to be sufficient predicate for a frisk or search for a revolver, although defined bulges in the outline or configuration of a gun do warrant a frisk. *(People v Prochilo,* 41 NY2d 759 [1977]; *People v Howard, supra,* 147 AD2d, at 181; *People v Cornelius, supra; People v Wiley,* 110 AD2d 590, 591 [1st Dept 1985].) Keeping these principles in mind, we cannot condone a "touch", let alone the abrupt search of a man's groin, to which Hovagim testified, where there was an undefined bulge inside the crotch area.[6]

---

5. While the dissent states, vis-à-vis Hovagim's instruction to turn around, "I find those words to be no more than a request for information" *(see,* dissenting opn, at 143), this command cannot be construed as an inquiry, nor is there any responsive answer to be given, as would be in a true request for information.

6. *People v Benjamin* (51 NY2d 267) erroneously relied upon by the dissent, is both legally and factually distinguishable, and, in fact, underscores the necessity of a reversal in the instant case. In *Benjamin,* two plain-clothes officers received a radio run advising them that there "were men with guns at a specified street location" *(supra,* 51 NY2d, at 269); here, the anonymous tip was that there was a man outside the building looking into cars, with no report of a gun, or any other weapon. The officers in the *Benjamin* case, upon arriving at the scene, observed approximately 30 people; here, as the dissent accurately noted, the police immediately found a man, Reyes, who fit the description given, casing cars, as the tipster had indicated. The defendant in *Benjamin,* a member of the group on the sidewalk, stepped backward and reached under his jacket into the rear of his waistband *(supra,* 51 NY2d, at 269, 271); this is in sharp contrast to the case at bar, in which defendant, who had come down the stairs turned around, motioned or waved his hands, and started going back up the stairs

There are a number of inherently innocuous objects which could have been the cause of a bulge in this area. Accordingly, we hold this to be an unwarranted intrusion.

We are unconvinced by Hovagim's ritualistic incantation that the bulge put him in fear of his life; the fact that he recovered drugs does not suddenly legitimize the search, just as the recovery of a gun would not. *(People v Howard, supra,* 147 AD2d, at 181 [where this court, including the author of the dissent herein, suppressed the gun recovered from the defendant where "(u)pon (the officers') unwarranted stop and detention of defendant, the officers observed a bulge in defendant's pocket, whereupon they immediately proceeded to frisk the defendant, offering in justification the ritualistic litany that such bulge placed them in fear of their lives"]; *People v Cornelius, supra,* 113 AD2d, at 672 [where we suppressed guns found pursuant to illegal searches].) As noted by Justice Fein in *Cornelius (supra,* at 669), "[w]hatever 'fear for their safety' the police may have felt as an immediate predicate for their subsequent search for a gun *(see,* CPL 140.50 [3]) was solely a result of an unwarranted intrusion in the first place."

■ Furthermore, defendant's statement, which the hearing court determined to be a spontaneous utterance, must nevertheless be suppressed as the fruit of the illegal police conduct, which resulted in his unlawful arrest. *(Wong Sun v United States,* 371 US 471, 486-488 [1963]; *Dunaway v New York,* 442 US 200, 216-218 [1979]; *People v Johnson,* 129 AD2d 739 [2d Dept 1987].)

Accordingly the judgment of the Supreme Court, New York County (Herbert J. Adlerberg, J., at *Mapp/Huntley* hearing, Edward J. McLaughlin, J., at plea and sentence), rendered June 28, 1989, convicting defendant upon his plea of guilty, of criminal possession of a controlled substance in the second degree, and sentencing him to an indefinite period of three years' to life imprisonment, should be reversed, on the law, the motion to suppress granted, and the indictment dismissed.

Ross, J. (dissenting). I would affirm Criminal Term's denial of defendant's suppression motion.

During the afternoon of October 26, 1988, Mr. Bienvenido

---

as if, according to the *police witness,* he had forgotten something, without ever reaching into his waistband or pockets *at all.* Finally, the gun recovered from *Benjamin* was, indeed, tucked into his waistband, unlike the drugs we are now suppressing, which were found in defendant's groin.

Taveras (defendant) was arrested for the possession of cocaine. Thereafter, by indictment number 10826, filed November 4, 1988, a New York County Grand Jury charged defendant with committing the crime of criminal possession of a controlled substance in the first degree (Penal Law § 220.21). Following indictment and the entry of a plea of not guilty, defendant moved to suppress physical evidence and a postarrest statement.

In April 1989, a *Mapp/Huntley* hearing commenced before Justice Herbert J. Adlerberg. At the hearing, both the People and the defense presented evidence.

The People's evidence consisted of the testimony of New York City Police Officers, Thomas Hovagim (Officer Hovagim) and Wilfredo Occasio (Officer Occasio), and is summarized as follows:

On October 26, 1988, at about 3:00 P.M., Officers Hovagim and Occasio, assigned to the 34th Precinct, were on routine patrol, in a marked radio car, when a woman flagged them down. According to the officers' testimony, this woman told them that a man, whom she described, was looking into vehicles which were parked along West 172nd Street, New York County.

Thereafter, the officers drove around the corner and observed "a male [H]ispanic looking into autos, right in front of the building [, which was located at 615 West 172nd Street] [premises]".

The officers exited their vehicle and approached the man, whose description matched that given by the woman informant.

These officers, who later learned that this man's name is Mr. Cesar Reyes, asked him for identification ("ID") and his address. Mr. Reyes replied that his "ID" was upstairs in apartment 5G of the premises, where he resided. Thereupon, Mr. Reyes voluntarily entered the premises with the officers, and they waited in the lobby for an elevator to take them to apartment 5G, where the officers would be able to verify Mr. Reyes' identity.

While they were waiting in the lobby, the defendant was walking down the stairs, until he saw the officers. He then turned "around and starts to go upstairs". At that point, Mr. Reyes shouted out to defendant, in Spanish, that should the defendant be asked "[i]f Maribel is upstairs, say, 'No' [and, defendant's] response was, 'No' ". Since Officer Occasio spoke

Spanish, he immediately translated the conversation between Mr. Reyes and the defendant for Officer Hovagim.

After the translation was completed, Officer Hovagim asked the defendant where he lived, and if he knew Mr. Reyes. Defendant replied that he lived in apartment 5G, but he did not know Mr. Reyes. Thereafter, Officer Hovagim testified "He [defendant] has his head turned to me, not his full body. I asked him, 'Could you please turn around? I'm talking to you.' He turns around at that time. I noticed a huge lump in his pants, right below the waistband to the right. Fearing for my safety, thinking it could hurt me. It looked hard".

The court had the following colloquy with Officer Hovagim concerning the specific location of that bulge:

"[THE COURT] Q: Officer * * * stand up and indicate where you saw that bulge?

"[OFFICER HOVAGIM] A: Okay. (standing) Sure. Right underneath the belt, right around here. (indicating) This area right here, a little bit more to the center, and to the center.

"Q. Between the waist and groin area?

"A. Right".

Now, Officer Hovagim testified "I felt the object outside his [defendant] pants. And, it was hard. And, I just went right in [to defendant's pants] and pulled it out". Officer Hovagim had pulled out a clear plastic bag, containing a white substance, which, after chemical analysis, was found to be approximately 10 ounces of cocaine, in rock form. During the hearing, the subject plastic bag, with its contents, was placed into evidence by the People, without defense objection.

After removing the plastic bag from the defendant's person, Officer Hovagim placed defendant under arrest.

Although defendant was in custody, the officers still desired to identify Mr. Reyes. While they waited for the elevator to take them to apartment 5G, at that time, a woman came into the lobby, passed them, and also waited for that elevator. Officer Hovagim testified that this woman, whose name the officers later learned is Ms. Corin Sanchez, turned "around to me, and says, 'Is something wrong?' I asked her, 'Why?' She said, 'That's my husband.' Pointing to Mr. Reyes. I said 'What apartment do you live in?' She says '5G'. Okay. Everybody go up to 5G. Everybody is claiming to live there. I asked [Ms. Sanchez] for ID. 'I [Ms. Sanchez] don't have it. It's in the apartment. So is my husband's ID'. She goes into the apart-

ment: shows me ID, with her and her husband. Stating, they live there".

Subsequent to verifying the identities of Mr. Reyes and Ms. Sanchez, the officers had no further dealings with them.

Thereafter, Officer Hovagim testified "while walking the defendant out to the radio car, he [defendant] said that, 'I don't buy or sell crack. I'm—I mean, I don't buy crack or smoke crack, or sell it. I'm just paid to transport it' ".

Finally, both officers testified that they had previously made weapons arrests, and during the entire incident, which extended from the time they first saw Mr. Reyes until they drove off with defendant, in custody, they never drew their guns.

The only witnesses to testify for the defense were Mr. Reyes and Ms. Sanchez.

Mr. Reyes testified, in substance, that he was standing in front of the premises when the officers arrived; they asked him what he was doing there, he replied that he was waiting for his brother to pick him up, and they were going to visit his brother's girlfriend, whose name was "Milagrose [sic]," and she resided in apartment 5G of the premises; then the officers allegedly searched him in the street; thereafter, the officers brought him into the lobby of the premises, for the purpose of taking him to apartment 5G, although he had informed them Ms. "Milagrose [sic]" was not at home; while they waited for the elevator, the defendant either came down the stairs or by elevator; he admitted having a conversation with defendant, but does not remember defendant's response; thereupon, the officers placed defendant and Mr. Reyes against the wall; while one officer allegedly held Mr. Reyes at gunpoint, the other officer searched defendant; during the search, Ms. Sanchez entered the lobby, and she was on her way to see Ms. "Milagrose [sic];" she asked what was going on; in response, the officers asked her who she was, and they searched her pocketbook.

Both Mr. Reyes and Ms. Sanchez testified, in substance, that after searching Ms. Sanchez' pocketbook or shopping bag, the officers searched defendant twice more; one of the officers stated he felt "something", and, thereupon, that officer undid defendant's pants and belt, put his hand inside, and withdrew a bag from the area of defendant's groin.

Also, both Mr. Reyes and Ms. Sanchez testified, in sub-

stance, that the officers, at gunpoint, took them to apartment 5G; and, thereafter, they were released.

After hearing all of the evidence, the hearing court denied the suppression motion, upon the basis it, *inter alia,* found the officers' testimony credible, and the defense testimony incredible. Specifically, the hearing court stated "I * * * point to the various inconsistencies between the witness Sanchez and Reyes regarding the length of time of these searches. I find that that is tailored testimony. Mainly to assist this defendant out of a difficult situation. I credit the officers' testimony in all respects".

Following the denial of the suppression motion, defendant pleaded guilty to the crime of criminal possession of a controlled substance in the second degree (Penal Law § 220.18), and he was sentenced to an indeterminate prison term of three years to life.

It is well-established law that the police have a right to approach a person for the purpose of requesting information, so long as they have an articulable reason for doing so *(People v De Bour,* 40 NY2d 210, 213 [1976]). Further, the Court of Appeals states, in *People v De Bour (supra,* at 217), "[t]he crucial factor is whether or not the police behavior can be characterized as reasonable". In other words, in determining what is reasonable police conduct, a court must consider the police officer's actions "as a whole, remembering that reasonableness is the key principle" *(People v Chestnut,* 51 NY2d 14, 23 [1980], *cert denied* 449 US 1018 [1980]).

My review of the hearing transcript clearly indicates that witness credibility was the issue before the hearing court, and it is the issue before us on appeal.

The testimony of Mr. Reyes and Ms. Sanchez, who were the defense witnesses, is diametrically opposed to the testimony of Officers Hovagim and Occasio, concerning the issue of whether Officer Hovagim's actions toward defendant was reasonable *(People v Chestnut, supra).*

This court has repeatedly held that the trier of fact is in the best position to evaluate credibility, since it observes the witnesses, in the crucible of the courtroom *(see, for example, People v Wright,* 71 AD2d 585, 586 [1st Dept 1979]; *People v Stroman,* 83 AD2d 370, 372 [1st Dept 1981]; *People v Cesar,* 111 AD2d 707, 710 [1st Dept 1985]; *People v Rivera,* 121 AD2d 166, 171 [1st Dept 1986]). I find particularly applicable to the instant case, these words that this court wrote in *People v*

*Wright (supra,* at 586) "Credibility is determined by the trier of facts who has the advantage of observing the witnesses and necessarily is in a superior position with respect to that aspect than an appellate court which reviews but the printed record (see *People v Cohen,* 223 NY 406, 422-423; Fisch, New York Evidence, § 446)."

After examining the majority opinion, which concludes that Officer Hovagim did not act reasonably in touching defendant's person and investigating the bulge, I find the majority's arguments in support of that conclusion to be, in substance, that the officers' testimony was incredible. In this connection, I find significant that the majority cites no evidence to support their conclusion, which was not before the hearing court and evaluated by it. In other words, the majority would substitute its own findings of fact and conclusions of law for that of the hearing court. Although we have the legal authority to do same, such substitution is not justified by this record.

The hearing court found that Officer Hovagim had no contact with, and did not ask defendant a single question, until after Mr. Reyes had a conversation, in Spanish, with defendant, which was translated into English for Officer Hovagim by Officer Occasio. At that point, the hearing court found that Officer Hovagim asked the defendant where he lived and if he knew Mr. Reyes, and the defendant, without turning his full body toward Officer Hovagim, answered he lived in apartment 5G, but denied knowing Mr. Reyes, who had earlier told the officers that he lived there. Now, the hearing court found that Officer Hovagim requested that defendant turn around.

Unlike the majority, who classifies Officer Hovagim's request to defendant to turn around as an "authoritative act of ordering defendant to turn around" *(see,* majority opn, at 136), I find those words to be no more than a request for information, in view of the unusual response of defendant that he did not know Mr. Reyes, although they supposedly both lived in apartment 5G. Further, I find that request a reasonable action on the part of the officer, based upon these circumstances *(People v De Bour, supra,* at 217; *People v Chestnut, supra,* at 23).

When Officer Hovagim requested defendant to turn around, the hearing court did not find that request accompanied by any compulsion, such as a drawn gun, by either officer. Although defendant could have ignored that request, he immediately voluntarily complied with it.

As soon as the defendant turned around, Officer Hovagim testified "I noticed a huge lump in his pants, right below the waistband to the right. Fearing for my safety, thinking it could hurt me. It looked hard".

Since "a waistband bulge is telltale of a weapon" *(People v De Bour, supra,* at 221), and Officer Hovagim testified that, in the year and one half he had been assigned to the 34th Precinct, he had made 5 or 6 weapons arrests, in my opinion, it is reasonable to objectively understand Officer Hovagim's fear, when confronted by defendant's waistband huge bulge, which appeared hard.

Although the majority, in their opinion, at page 138, ridicules Officer Hovagim's apprehension, by stating "We are unconvinced by Hovagim's ritualistic incantation that the bulge put him in fear of his life", a unanimous Court of Appeals, in *People v Benjamin* (51 NY2d 267, 271 [1980]), states "[i]t would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety".

In order to remove this threat, Officer Hovagim testified he first "felt the object outside his [defendant's] pants. And, it was hard. And, I just went right in [to defendant's pants] and pulled it [the plastic bag of cocaine] out".

I agree with the hearing court's finding that Officer Hovagim's action in removing the plastic bag of cocaine, was "reasonably limited in scope and intensity" *(People v De Bour, supra,* at 221).

Further, I agree with the hearing court's finding that defendant's postarrest spontaneous statement, described *supra,* is admissible, since it was made freely, and without police prompting *(People v Grimaldi,* 52 NY2d 611, 617 [1981]).

I find nothing in this record to justify the majority's conclusion that the police officer, in stating he was in fear when he observed a hard bulge just below the waistline, was expressing a "ritualistic incantation".

The hearing court had the benefit of the appearances before it of all the witnesses; it heard them and observed their demeanor, and it fully credited the testimony of the police officers and found the testimony of Mr. Reyes and Ms. Sanchez to be tailored and incredible. I agree.

Based upon my analysis *supra,* accordingly, I would affirm the denial of the suppression motion, as to both physical

evidence and the defendant's postarrest statement, and the conviction.

MILONAS and ROSENBERGER, JJ., concur with CARRO, J.; SULLIVAN, J. P., and ROSS, J., dissent in an opinion by ROSS, J.

Judgment, Supreme Court, New York County, rendered on June 28, 1989, reversed, on the law, the motion to suppress granted, and the indictment dismissed, as indicated.