■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LESLIE RIVERA, Appellant.—Judgment, Supreme Court, Bronx County (Jack Rosenberg, J., at suppression hearing; Burton Hecht, J., at plea and sentence), rendered January 3, 1985, which convicted defendant, upon his plea of guilty, of the

crime of criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]), and sentenced defendant, as a second felony offender, to an indeterminate prison term of 2½ to 5 years, is affirmed.

Early in the afternoon of February 9, 1984, in Bronx County, New York City Police Officer Wilfredo Morales (Morales) arrested defendant for the possession of a loaded .38 caliber revolver. Following his indictment for two counts of the crime of criminal possession of a weapon in the third degree (Penal Law § 265.02 [3], [4]), defendant moved to suppress this weapon, as well as allegedly incriminating statements that he made after he was arrested. Thereafter, a suppression hearing was held.

On February 9, 1984, Officer Morales had been a member of the police department for three years, and he, together with three other officers, was on radio motor patrol. At approximately 1:30 P.M., these officers received a radio run call, which reported that male Hispanics with a gun were arguing in a hallway of 1065 Manor Avenue, Bronx County. All of the officers, including Morales, were in uniform, and they were in a marked police vehicle. The officers arrived at the building in approximately two minutes.

After exiting the police car, Morales testified that he walked, alone, into the courtyard that led to the entrance of 1065 Manor Avenue. Furthermore, Morales testified that, when he was approximately 10 feet from the doorway, he saw the defendant come out of it, and the defendant was dressed in a short open jacket, an open red-hooded sweater, a blue T-shirt, and snugly fitting grey pants. Moreover, Morales testified, in pertinent part, that: "As he [defendant] faced me I [Morales] saw what appeared to be a bulge on his right waistband". Thereafter, Morales asked the defendant if he lived in this building, and defendant answered "No". As the defendant moved closer to Morales, the officer testified, in pertinent part, that: "I was able to see what appeared to be the stock of a wooden handle [protruding from the defendant's waistband], at which time I drew my revolver and told him [defendant] to place his hands on the wall". Morales testified that he had drawn his service revolver in order to protect himself.

When defendant complied with this direction to put his hands up against the wall, Morales further testified in pertinent part, that: "I [Morales] saw the complete handle of the revolver [since] the [defendant's] shirt lifted completely * * * from * * * over his waistband". Now, Morales removed from

the right side of the defendant's waistband a loaded .38 caliber revolver with a large grip. Subsequently, this officer arrested defendant and transported him to a police precinct.

Shortly after they were in the precinct, Morales read defendant the *Miranda* warnings. In response, defendant replied that he understood them, and that he was willing to answer questions. Thereafter, Morales testified, in pertinent part, that: "I asked him [defendant] about the gun. He told me that he bought it on 138th Street and Brook Avenue because he had a store and it was just for protection".

Later, during the day of defendant's arrest, he was interrogated by Detective James Byrne (Byrne) of the Bronx Career Criminal Investigation Unit. Before beginning his questioning, Byrne advised defendant of the *Miranda* warnings, and defendant agreed to answer questions. Subsequently, defendant signed a statement in which he acknowledged possession of the gun and why he had it.

Our examination of the suppression hearing minutes indicates that Morales was intensively cross-examined by defense counsel about the circumstances of defendant's arrest.

At the suppression hearing, the defendant testified in his own behalf. In substance, the defendant testified that he left the subject building carrying an unholstered gun, which was tucked into the front of his waistband, and the brown wooden handle of that gun was supported by his belt, so that the weapon would not fall through his pants; before going out of the building, he closed his jacket, by fastening its single button; as he walked through the courtyard, he met a police officer, who asked defendant if he lived in the building; the defendant answered "No"; immediately thereafter, this officer told defendant to put his hands up against the wall, patted defendant down, placed a gun to defendant's neck, reached under defendant's jacket, and removed defendant's gun; and, defendant was questioned before he received the *Miranda* warnings.

Defense counsel argued at the suppression hearing that the motion to suppress should be granted due to the fact that the People allegedly had failed to prove probable cause for the stop and pat down of the defendant by Officer Morales, which resulted in the recovery of the gun. In support of this contention, defense counsel alleged that there were inconsistencies in Morales' claim that, prior to drawing his gun and ordering defendant to place his hands on the wall, he had observed "what appeared to be the stock of a wooden handle" protrud-

ing from defendant's waistband, since this claim of Morales was absent from the accounts of the arrest he had given to the investigating Assistant District Attorney (ADA) and to the Grand Jury, and was allegedly belatedly added to Morales' memo book entry of the incident. Furthermore, defense counsel speculated that the subject claim by Morales consisted of the kind of words that he may have heard sometime in the past, and now he may have used them to help him overcome any alleged constitutional deficiencies in the instant case.

During the course of his testimony, Officer Morales stated that he wrote the words "observed gun butt" above the line in his memo book where he had made the initial entry pertaining to the incident. In pertinent part, Morales testified that he added the quoted words later "on the same day" that he had made the arrest.

The suppression court denied defendant's motion to suppress in its entirety, since it found Officer Morales' account of his encounter with defendant to be credible. As to the defendant's testimony, the suppression court observed: "that as to the major points that are contradictory of the police testimony, I find the defendant not credible".

Specifically, in its decision, the suppression court discussed in detail the alleged inconsistencies, mentioned *supra,* that defendant contended undermined the credibility of Officer Morales' hearing testimony that, prior to drawing his gun and ordering defendant to place his hands on the wall, he had seen "what appeared to be the stock of a wooden handle" protruding from the defendant's waistband.

First, the suppression court held that the absence of reference to this observation by Morales in the investigating ADA's report was probably chargeable to "negligence" on the part of the District Attorney's staff. The suppression court stated: "[T]his District Attorney's report was made five days [after Morales testified he had made his memo book entries]. I have had that problem before, with all due respect to members of the District Attorney's staff, their negligence has occurred too. And I'm not saying it's so. I'm saying they are in such a rush to get the basic background, and I'm sure that if they paid attention to the law in making this memo and gave this some thought, they might have dug deeper to find out specifically. But that's the way of the operation, it's not saying what happened or don't [sic] happen, there's no such evidence". Incidentally, the investigating ADA, who made out this report, did not testify at the hearing, and his terse report reads as follows: "Arresting officer responded to radio run of man

with gun. Arresting officer observed the defendant who had a bulge in his waistband. Arresting officer asked defendant if defendant lived in the building. Defendant said 'no'. Arresting officer frisked the defendant and recovered a .38 special with 6 live rounds. The gun was defaced. Defendant was placed under arrest".

Second, the suppression court noted that the omission from Morales' Grand Jury testimony of the subject statement was probably attributable to "the nature of questions asked by the Assistant District Attorney in the speed of the day, officers not overly experienced as this officer, in my opinion, being on the force for three years and having had goodly education, so to speak, in the drug area; may not have had, apparently to me, did not seem to be overly knowledgeable so that he would be looking carefully as to the words that he used to make out probable cause". We have examined this excerpt from the Grand Jury minutes to which the suppression court made reference, since it appears in the suppression hearing minutes as a result of its introduction by defense counsel. Based upon our review, we find that it clearly indicates that Officer Morales, instead of being questioned by the ADA in the Grand Jury about what happened, was simply asked to give his account of the events in the form of a monologue, uninterrupted by questions. This excerpt reads, as follows:

"QUESTION: Officer Morales, kindly tell the members of the grand jury the circumstances which led to the arrest of Leslie Rivera.

"ANSWER: I was responding to a call in front of the guilding [sic]—that building of a man with a gun, male Hispanic arguing in the hallway. As I approached the building, Leslie came out the door. I I [sic] noticed a bulge in his waistband. I asked him if he lived there. He told me no. I told him, put your hands against the wall and once I approached him I had the gun drawn. In the front waistband, the gun—[it says b-o-t-t-o-n, I assume that is butt] was sticking out and at that time I removed the gun and put the handcufss [sic] on him."

Third, the suppression court found Morales' testimony credible, as to the time when he added the words "observed gun butt" to his original memo book entry. In pertinent part, the suppression court stated that Morales added those words: "immediately after or very soon after the original memo book notations were made. Counsel has asked me to infer that he [Morales] received information from older heads, so to speak, that's not his language, but my expression, and allegedly

changed it. There is no such evidence, it has not been adduced by believable credible evidence".

On appeal, the single contention that defendant makes is that Officer Morales allegedly tailored his testimony "to provide a pretext justification for the otherwise impermissible search and seizure of" defendant. After reviewing the more than 200-page suppression hearing minutes, we find this contention meritless.

A unanimous Court of Appeals, in an opinion by now Chief Judge Wachtler, stated, in *People v Benjamin* (51 NY2d 267, 271 [1980]), that: "[I]t may almost be considered common knowledge, that a handgun is often carried in the waistband". In fact, even defendant concedes, at page 10 of his brief, that the observation of a gun butt in his waistband would provide probable cause for defendant's arrest.

In determining what is reasonable police conduct, we must consider the police officer's actions "as a whole, remembering that reasonableness is the key principle" *(People v Chestnut,* 51 NY2d 14, 23 [1980], *cert denied* 449 US 1018 [1980]).

Witness credibility was the issue before the suppression court, and it is the same issue before us on appeal.

The experienced suppression court specifically found the officer credible. This court has repeatedly held that the trier of facts is in the best position to determine credibility, since it observes the witnesses, in the crucible of the courtroom *(see, for example, People v Wright,* 71 AD2d 585, 586 [1st Dept 1979]; *People v Stroman,* 83 AD2d 370, 372 [1st Dept 1981]; *People v Cesar,* 111 AD2d 707, 710 [1st Dept 1985]). We find particularly applicable herein these words that we wrote in *People v Wright (supra,* at p 586): "Credibility is determined by the trier of facts who has the advantage of observing the witnesses and necessarily is in a superior position with respect to that aspect than an appellate court which reviews but the printed record (see *People v Cohen,* 223 NY 406, 422-423; Fisch, New York Evidence, § 446)".

In substance, the dissent claims that there was no probable cause for defendant's arrest, since Morales' testimony that he saw the gun butt before the arrest was incredible. The dissent supports this contention primarily by the same arguments made by defense counsel to the suppression court, and those arguments dealt with the added entry to Morales' memo book, and the absence from the investigating ADA's report and Morales' testimony to the Grand Jury of any reference to Morales seeing "what appeared to be the stock of a wooden

handle [protruding from the defendant's waistband]" prior to his drawing his revolver and patting down defendant. As mentioned *supra,* the suppression court disposed of those defense arguments upon the basis of credibility, and we find that the suppression court's analysis is equally applicable to these same arguments when made by the dissent. A unanimous Court of Appeals wrote, in *People v Concepcion* (38 NY2d 211, 213 [1975]), that: "The claim that the testimony of the officer * * * was so riddled with inconsistencies and improbable fortuities that it must be deemed incredible as a matter of law must be rejected. Not only are the alleged discrepancies insignificant in comparison to the totality of the officer['s] testimony, but they bear little, if any, relevance to the fundamental factual issues. To the extent that the credibility of the balance of [his] testimony is challenged, we need only reiterate that credibility is a factual issue".

Our examination of the dissent indicates that none of its arguments is supported by any evidence that was not before the suppression court. We find that the dissent's speculation as to the reasons why the added entry to Morales' memo book was made, and as to the absence from the investigating ADA's report and Morales' Grand Jury testimony of any reference to Morales seeing "what appeared to be the stock of a wooden handle [protruding from the defendant's waistband]" prior to his drawing his revolver and patting down defendant, does not become a fact, when, as it is here, unsupported by any evidence.

The high degree to which the dissent relies on speculation rather than facts is evidenced by the statement that appears on page 175 of the dissent, which reads: "Common sense would also dictate that a person would not walk right up to a police officer with the stock of a gun visibly present". In setting forth this speculation, the dissent disregards the defendant's own testimony that, when he walked through the door of 1065 Manor Avenue and into the courtyard, he did not know that a police officer was standing out there. In pertinent part, defendant testified in answer to these questions on cross-examination:

"Q. [QUESTION Assistant District Attorney]: As you were coming out of the building, you didn't expect to see the police officer; did you?

"A. [ANSWER]: No, sir.

"Q.: In fact, you had no idea the police officer was out there; is that right?

"A.: That is right.

"Q.: As you were coming out of the building you had the gun in your front waistband; is that correct?

"A.: Yes, sir."

In summary, we find that the evidence in the instant case raised issues of credibility, which the suppression court was best able to determine, since it was "Face to face with living witnesses [and therefore] the original trier of the facts holds a position of advantage from which appellate judges are excluded" *(Boyd v Boyd,* 252 NY 422, 429 [1930]; *see also, Matter of Louise E. S. v W. Stephen S.,* 64 NY2d 946, 947 [1985], which cites *Boyd v Boyd* as authority). Unlike the dissent, we do not find Officer Morales' testimony incredible as a matter of law.

Accordingly, we affirm. Concur—Kupferman, J. P., Sandler and Ross, JJ.

Carro and Wallach, JJ., dissent in a memorandum by Carro, J., as follows: The State's case falls or stands on whether Police Officer Wilfredo Morales' testimony at the suppression hearing, that he observed the stock of a gun handle protruding from defendant's waistband before ordering him up against the wall for a frisk, was credible. Based on Morales' prior testimony before the Grand Jury, his interview with an Assistant District Attorney and the belated correction to his memo book entry on this incident, I conclude that Officer Morales' credibility on this issue was irreparably damaged and that his testimony at the hearing was "incredible as a matter of law" and " 'patently tailored to nullify constitutional objections.' " *(People v Quinones,* 61 AD2d 765, 766; *see also, People v Garafolo,* 44 AD2d 86, 88-89; *People v Smith,* 77 AD2d 544, 546.)

The hearing minutes reveal that on February 9, 1984, in response to a radio run of Hispanic males with a gun arguing in a hallway of 1065 Manor Avenue in The Bronx, Police Officer Morales arrived at the location and saw defendant leaving the building. Morales first saw a side view of defendant from a distance of about 10 feet. Morales asked defendant if he lived in the building and defendant responded that he did not. As defendant faced him, Morales saw "what appeared to be a bulge in his right waistband" but could not tell what the bulge was.

As defendant came closer, Morales saw "the stock of a wooden handle", drew his revolver, and told defendant to place his hands on the wall. Defendant complied. Morales was

then able to see the complete handle of the gun as defendant's shirt lifted up. Morales removed the gun and arrested defendant.

On cross-examination Morales was confronted with the following account of the arrest he made to the Grand Jury:

"QUESTION: Officer Morales, kindly tell the members of the grand jury the circumstances which led to the arrest of Leslie Rivera.

"ANSWER: I was responding to a call in front of the * * * building of a man with a gun, male Hispanic arguing in the hallway. As I approached the building, Leslie came out the door. I noticed a bulge in his waistband. I asked him if he lived there. He told me no. I told him, put your hands against the wall and once I approached him I had the gun drawn. In the front of the waistband the gun * * * butt was sticking out and at that time I removed the gun and put the handcuffs on him."

Counsel also introduced the report prepared by the investigating Assistant District Attorney, which likewise failed to include the crucial piece of information that Morales saw the gun stock before ordering defendant up against the wall in order to frisk him. Further testimony was elicited that after having made his notations in his memo book concerning the arrest, Morales later inserted above the line where he wrote that he ordered defendant up against the wall, the words "observed gun butt, as defendant got closer."

The hearing court concluded that the officer's testimony that he observed the stock of the gun before ordering defendant up against the wall was credible and furnished the probable cause necessary to arrest and frisk defendant. The court concluded that the absence of this observation from the officer's account to the Grand Jury was a product of the fact that "by the nature of questions asked by the Assistant District Attorney in the speed of the day, officers not overly experienced as this officer * * * being on the force for three years and having had goodly education, so to speak, in the drug area, may not have had, apparently * * * did not seem to be overly knowledgeable so that he would be looking carefully as to the words that he used to make out probable cause." As to the memo book entry, the court opined that "when he made this entry he did not give the consideration of the technicality that counsel laid great weight on." The court then blamed the omission of the statement from the investigating District Attorney's report on the "negligence" of the

District Attorney's staff who are "in such a rush to get the basic background \* \* \* that if they paid attention to the law in making this memo and gave this some thought, they may have dug deeper to find out specifically."

Although issues of credibility are primarily for the trial court, reversal is warranted when the trial court's fact findings are unjustified by the evidence. *(People v Garafolo, supra.)* What makes the officer's testimony concerning his observation of the gun stock before deciding to frisk defendant so incredible is the conspicuous absence of that important detail in his earlier accounts to the Grand Jury and the investigating Assistant District Attorney and the belated addition of that fact to his memo book. The court's reliance on the officer's lack of experience as an explanation for the glaring omission of this fact is unavailing. The hearing court opined that this officer, who had been on the force for three years, was perhaps unknowledgeable as to the words he should have used "to make out probable cause." However, the omission here was not in the failure to provide some kind of technical characterization of the defendant's behavior, but an omission of a fact that either occurred or did not occur, and which if it occurred would definitely have left a marked impression on the officer.

The difference to an officer of an indescribable bulge and the stock of a gun is substantial. Since it would provide the actual and only reason for the arrest, under these facts, it is not likely to be a detail that any officer would forget to include in his memo book when he first writes up his account of the arrest. Nor is it a detail that he would forget to tell an Assistant District Attorney. What is more credible and, in fact, supported by a reading of Morales' Grand Jury testimony, is that Morales did not see the gun stock until after he told defendant to put his arms up against the wall, which caused defendant's shirt to rise up and reveal the secreted gun. Common sense would also dictate that a person would not walk right up to a police officer with the stock of a gun visibly present. In combination, the belated addition to the memo book of this observation and its omissions in the Grand Jury testimony and the interview with the Assistant District Attorney all point very clearly to the fact that the officer's hearing testimony was patently tailored to provide a pretext for the otherwise impermissible search and seizure of defendant.

In fact, contrary to the majority's assertion that I have engaged in speculations as to the absence of this detail in the Grand Jury minutes and the interview with the Assistant

District Attorney, it is the hearing court which determined the officer's credibility based on unsupported speculations it made as to the negligence and carelessness of the District Attorney's office and the supposed inexperience of Officer Morales. I have based my conclusion instead on the conspicuous absence of this critical detail.

The frisk of defendant could only have been upheld if Morales had first seen the gun or evidence of the gun as opposed to an unspecified bulge. Because I conclude that the gun was not observed until after Morales ordered defendant up against the wall, this search was improper. When a police officer entertains a reasonable suspicion that a person has committed, is committing or is about to commit a crime he may seize that person temporarily for questioning and frisk him if the officer reasonably suspects that he is in danger of physical injury from this person. *(People v De Bour,* 40 NY2d 210, 223.) A reasonable belief that a person has a gun in his possession requires "proof of a describable object or of describable conduct that provides a reasonable basis for the police officer's belief". *(People v Prochilo,* 41 NY2d 759, 761.)

When Morales saw defendant leaving the building, defendant was not behaving suspiciously or making any furtive gestures. Morales had received an anonymous tip of Hispanics with guns at this building, but no descriptions were provided and defendant was seen alone. Morales noticed a bulge at defendant's waistband but could not tell what it was. Under these circumstances there was not sufficient evidence from which the presence of a gun could with reasonable certitude be inferred. *(See, People v Goings* [reported with *People v Prochilo, supra],* 41 NY2d, at p 763.)

Accordingly, I would suppress the gun, vacate this conviction and dismiss the indictment.