THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
TIMOTHY HOWARD, Appellant.

First Department, June 8, 1989

APPEARANCES OF COUNSEL

*Barbara Zolot* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Laurie Sapakoff* of counsel *(Catherine M. Cook* with her on the brief; *Robert M. Morgenthau, District-Attorney,* attorney), for respondent.

## OPINION OF THE COURT

ELLERIN, J.

In this case we are once again called upon to determine the appropriateness of particular police conduct in light of the constitutional right which every individual has to be secure against unreasonable searches and seizures on our public streets and elsewhere.

The facts are relatively simple and not in dispute. At approximately 10:00 P.M. on the evening of November 4, 1985, Police Officers Joseph Thomas and Jerome Canzaneri were on duty, seated in a marked patrol car in the vicinity of 116th Street and Lenox Avenue, on the lookout for traffic violators. From a distance of about three quarters of a block away, the officers observed the defendant Howard who was standing on the northeast corner of 116th Street and Lenox Avenue, near the subway entrance located there. During the next 2 or 3 minutes, the police officers watched Howard as he looked up and down Lenox Avenue and 116th Street, up and down the subway stairs watching people come out of the station, and thereafter returning to a position near the wall at the corner. Two or three times during this period, he placed his right hand inside the left side of his jacket "as though he were adjusting something".

Based on nothing beyond these observations, and the fact that this was a location of frequent robberies, the police officers decided to approach the defendant. As the patrol car drove towards him, the defendant walked away, whereupon the police officers shouted "Halt. Police" and told him they wanted to ask him a few questions. Defendant stopped, turned to face them, raised his arms, and stated words to the effect that he hadn't done anything. The officers then walked toward him. Both officers testified that the defendant was holding his left arm in a rigid position against his left side, and that as they approached they noticed a bulge of approximately 3 to 5 inches in his left front jacket pocket. While the officers' testimony indicated that the bulge had no distinct shape or

outline, nor was identifiable in any other way as a gun, upon reaching defendant, Officer Thomas proceeded to pat the bulge, which he stated felt like a revolver. The officers then drew their guns, pushed defendant against the car, and frisked him, recovering the gun in issue.

As the dissent properly notes, the common-law right to inquire is activated by a founded suspicion that criminal activity is afoot and permits a police officer to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure *(People v De Bour,* 40 NY2d 210). The dissent concludes that here "the police observed the defendant for several minutes and reasonably found that his conduct was suspicious" and therefore had a right to approach him and inquire.

At the outset, we cannot agree that the circumstances observed by the officers rose to the level of reasonable suspicion. "Reasonable suspicion" has been defined as the quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe that criminal activity is at hand. *(People v Sobotker,* 43 NY2d 559; *People v Cantor,* 36 NY2d 106.) "The requisite knowledge must be more than subjective; it should have at least some demonstrable roots. Mere 'hunch' or 'gut reaction' will not do". *(People v Sobotker, supra,* at 564.) Nor will innocuous behavior alone generate a founded or reasonable suspicion that a crime is at hand. *(People v De Bour, supra,* at 216.)

Here, defendant's behavior during the short time he was being observed was innocuous or, at best, equivocal. He was standing near a subway entrance, at 10:00 P.M., looking down the subway stairs and up and down the streets, and then moving to stand near the wall at the corner. He was neither causing any disturbance, nor making any furtive or threatening gestures which might indicate that criminal activity was afoot. On the contrary, his conduct was consistent with the actions of a man waiting for his wife or a friend to exit the subway, as counsel argued before the hearing court, and who was seeking to secure his own safety at that time of night. The only other fact observed by the police was defendant twice reaching inside his jacket pocket as though he were adjusting something. This innocuous movement was readily susceptible of an innocent interpretation. It was an action reflective of adjusting one's clothing or suspenders or the nervous touching of one's pocket wallet. We find that this conduct, either alone or in conjunction with defendant's

equally innocuous movements near the subway entrance, would not constitute a founded suspicion that criminal activity was afoot, the necessary predicate for the type of limited interference, short of seizure, incidental to the common-law right of inquiry. *(See, People v Carrasquillo,* 54 NY2d 248, 252.)

While these officers undoubtedly had, as the trial court found, "some objective credible reasons for requesting information even absent evidence of criminality", this merely provided them with a basis for the first level "minimal intrusion of approaching to request information" *(People v De Bour, supra,* at 223). The fact that defendant walked away when he saw the patrol car approach, did not provide a basis for any greater level of intrusion. *(People v Howard,* 50 NY2d 583.)

The conduct of the police officers in this situation can, by no reasonable standard, be held to have been justified in its inception or reasonably related in scope to the circumstances which rendered its initiation permissible. *(People v De Bour, supra,* at 215.) Having observed defendant for a brief period engage in innocuous, or at most equivocal, behavior which provided them with an objective credible reason to approach and request information, these officers made no such attempt but, instead, immediately and peremptorily stopped and detained defendant by virtue of the authority of "the badge". "Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment * * *. This is true whether a person submits to the authority of the badge or whether he succumbs to force". *(People v Cantor,* 36 NY2d 106, 111.)

The actions of the police officers in issuing an authoritative directive to defendant to "Halt", with which he immediately complied, followed by the officers approaching, and without any preliminary inquiry, taking defendant's arm and subjecting him to a frisk, constituted nothing less than a forcible seizure. *(See, People v Silvestre,* 119 AD2d 601.) This police conduct would have been inappropriately intrusive even if defendant's actions prior to their encounter could be said to have provided a founded suspicion that criminal activity was afoot thereby activating the second level of permissible police intrusion, the common-law right of inquiry. *(See, People v Cornelius,* 113 AD2d 666; *People v Marine,* 142 AD2d 368; *People v Roberts,* 94 AD2d 237; *People v Silvestre, supra.)*

To justify the third level type of forcible stop and detention which took place here the police officers must, at the inception, have entertained a reasonable suspicion that Howard had committed, was committing or was about to commit a felony or misdemeanor (CPL 140.50 [1]). The corollary authorization to frisk arises if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50 [3]). Here, there was no reasonable basis to conclude that defendant had committed, was committing, or was about to commit a crime, the *sine qua non* for a stop and detention under the statute. There was even less justifiable cause to conduct the frisk. Upon their unwarranted stop and detention of defendant, the officers observed a bulge in defendant's pocket, whereupon they immediately proceeded to frisk the defendant, offering in justification the ritualistic litany that such bulge placed them in fear of their lives.

This court has frequently held that the mere observation of an undefinable bulge in a person's pocket is insufficient as a basis for a frisk or search for a revolver. *(See, People v Wiley,* 110 AD2d 590; *People v Cornelius, supra; People v Williams,* 79 AD2d 147.)* Unlike a waistband bulge which is a telltale of a weapon, a pocket bulge could be caused by any number of innocuous objects. *(People v De Bour, supra,* at 221.) In *People v Cornelius (supra)* where the court also found the forcible detention of defendant to be improper, it was aptly noted that "[w]hatever 'fear for their safety' the police may have felt as an immediate predicate for their subsequent search for a gun *(see,* CPL 140.50 [3]) was solely a result of an unwarranted intrusion in the first place" (at 669).

Moreover, in order to justify a frisk under the statute, the alleged apprehension or fear felt by an officer must be reasonable under the circumstances. *(See, People v Santiago,* 64 AD2d 355, 361.) In this situation there were no objective factors that could reasonably be said to warrant such apprehension when the officers detained and approached the defendant. There was no describable outline of a gun or any other reason to believe that defendant was armed or dangerous. On the contrary, defendant did not engage in any furtive movements, he immediately stopped when ordered, raised his arms and, complying with the officers, request, walked towards them without reaching inside his jacket. Significantly, the officers acknowledged that they did not have their guns drawn when they approached defendant. The unsupported conclusory statements by the officers at the hearing that they were afraid

for their lives appears to have been little more than a rote recital of the words deemed necessary to retroactively validate a patently improper search.

Finally, we address the officers' assertion that their suspicions of defendant were aroused and that their hunch was justified by the "robbery prone" nature of the location. While the nature and location of the area where a suspect is located may be one of the factors to be considered in determining whether the police acted reasonably (see, People v Bronston, 68 NY2d 880, 881), that factor alone cannot serve as the justification for untoward or excessive police behavior against those of our citizens who happen to live, work or travel in what are characterized as "high crime areas". That factor must " 'exist in combination with objective factors specific to the incident which together support a founded suspicion that some particular criminal activity may be afoot' ". (See, People v Marine, supra, at 372, citing People v Boulware, 130 AD2d 370, and People v Cornelius, supra.) Here, there was absolutely no objective indication that criminal activity was afoot or that defendant was engaged in criminal activity. A citizen is certainly entitled to stand and look about for 2 or 3 minutes on a street corner, in any neighborhood, and be free from arbitrary police encounters.

While we are sensitive to the need for, and recognize the difficulties attendant upon, vigilant law enforcement efforts in a society whose citizens are all too often the victims of crime and are understandably beset with fears regarding criminal activity, we also recognize our obligation to be ever vigilant to insure that such considerations do not overwhelm the constitutional bulwarks which have historically insured one's right to be secure against unreasonable and unjustifiable governmental intrusions upon one's privacy and security. The police response to defendant's activities in this case constituted precisely such an unwarranted and unjustifiable intrusion.

Accordingly, the motion to suppress the gun should be granted and the indictment dismissed.

The judgment of the Supreme Court, New York County (Rose Rubin, J., at hearing, plea, and sentence) rendered February 13, 1986, which convicted defendant, upon his plea of guilty, of attempted criminal possession of a weapon in the third degree and sentenced him to a prison term of 2 to 4 years, should be reversed on the law, the defendant's motion to suppress the evidence granted, and the indictment dismissed.

SMITH, J. (dissenting). This is an appeal from a judgment convicting defendant of attempted criminal possession of a weapon in the third degree in violation of Penal Law §§ 110.00 and 265.02 (4). The defendant pleaded guilty following the denial of his motion to suppress.

The only issues on this appeal are whether the police had a right to approach the defendant and to frisk him. Because I believe that the police conduct was proper, I would affirm the judgment. At the suppression hearing, the only testimony was by the two police officers who were involved in the arrest of the defendant, Joseph Thomas and Jerome Canzaneri. The record supports the findings of fact made by the trial court. They are as follows:

"Shortly before 10:00 on November 4, 1985, Police Officer Thomas and Police Officer Canzaneri both in uniform in a parked police car, observed the defendant in front of the subway entrance located on the northeast corner of 116th Street and Lenox Avenue in the County of New York approximately three quarters of a block from them. The area was well lit.

"Police Officer Thomas called his partner's attention to the defendant. Both police officers watched him for two to three minutes as the defendant looked up and down Lenox Avenue, up and down 116th Street, down the subway stairs and returned to his position near the wall on the corner.

"The defendant put his right hand across his chest to the left side of his jacket as though he were adjusting something inside his jacket, repeated those actions at least twice.

"A bulletin board in the 28th Precinct lists the area at 116th Street and Lenox Avenue as a robbery prone location as well as a burglary/narcotics traffic violation and accident prone location.

"The officers decided to approach the defendant. As they drove towards him, the police officers saw the defendant look in their direction, turn and walk in the opposite direction.

"However, he stopped when Officer Canzaneri shouted, 'Halt, police' and told the defendant that they wanted to ask him a few questions.

"The defendant raised his hands, turned to face the officers and walked towards them holding his left arm in a rigid position against his left side near his waistband.

"The officers approached the defendant without their guns drawn.

"When they were approximately two to five feet from the defendant, Officer Thomas noticed a bulge near the defendant's left front coat pocket which Officer Thomas believed to be a gun.

"The bulge was above the defendant's waistband and it was partially covered by his left arm.

"Officer Thomas patted the outside of the defendant's jacket. He felt the outline of a gun. Officer Thomas then informed Officer Canzaneri that the defendant had a gun at which point Officer Canzaneri drew his gun and placed the defendant against the police car.

"Officer Thomas attempted to retrieve the gun but was unable to do so. He then drew his gun while Officer Canzaneri holstered his gun and seized the defendant's gun, ripping the defendant's inner jacket pocket in the process.

"The defendant was arrested."

The defendant argues that there was an unconstitutional forcible stop, that the police officers had no basis for a common-law right to inquire and that the frisk was unjustified. The People argue that the police conduct was justified.

The police had a common-law right to inquire about the conduct of the defendant. In *People v De Bour* (40 NY2d 210, 223 [1976]), the Court of Appeals stated that "the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure". Here, the police observed the defendant for several minutes and reasonably found that his conduct was suspicious. They had a right to approach the defendant and to inquire. CPL 140.50 (1) states in part that "a police officer may stop a person in a public place * * * when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law, and may demand of him his name, address and an explanation of his conduct." Second, once the police approached the defendant and saw a bulge in an area where a gun would ordinarily be carried, they had the right to frisk him. Thus, CPL 140.50 (3) permits an officer, where he "reasonably suspects that he is in danger of physical injury," to "search such person for a deadly weapon or any instrument".

The defendant argues that there was no basis for a frisk

because the police did not observe that the bulge at the defendant's side was in the shape of a gun and cites *People v Prochilo* (41 NY2d 759 [1977]). While it is true that in the two frisks upheld by the Court of Appeals in *Prochilo,* the police had observed the outline of a gun, the case does not stand for the proposition that no frisk can ever be made unless the police see the outline of a gun. It should be remembered that in *Terry v Ohio* (392 US 1 [1968]), the case in which the United States Supreme Court upheld the right of the police to stop and frisk a person reasonably suspected of criminal activity, the detective never saw any outline or bulge before he frisked the three individuals. There, the detective had concluded that because of their actions, three men were "casing" a store prior to attempting a robbery. Here, the totality of the circumstances justified the approach of the officers to the defendant and the subsequent frisk.

MURPHY, P. J., ROSS and MILONAS, JJ., concur with ELLERIN, J.; SMITH, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered on February 13, 1986, reversed on the law, the defendant's motion to suppress the evidence granted, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.