OPINION OF THE COURT
Charles J. Tejada, J.
The defendant, Dean Smith, has been indicted and charged with criminal possession of a controlled substance in the third degree.
The defendant now moves before this court for an order suppressing the drugs that were recovered from him and a statement he made to the police.
On March 2, 1994, a pretrial hearing pursuant to Mapp v Ohio (367 US 643 [1961]) and People v Huntley (21 NY2d 829 [1968]) was held.
FINDINGS OF FACT
At the suppression hearing New York City Police Officers *834 Ira Greenberg and Mario Toro testified for the People. The defendant called no witnesses. According to the testimony the following occurred.
On February 5, 1993, Officer Greenberg was on a routine anti-crime patrol with Sergeant Fitzgerald. Both officers were in plain clothes in an unmarked police vehicle. At approximately 12 o’clock, midday, Officer Greenberg observed the defendant and another African American male standing on the corner of St. Nicholas Avenue and 136th Street. The officer observed a taxicab pulled up to where the defendant and his companion were standing, a conversation ensued and the cab left without the men. Within two minutes, the defendant hailed two more cabs. He had a conversation with each driver and each cab left without the defendant or his companion. Concluding that the defendant’s actions were indicative of actual or potential criminal activity, Officer Greenberg, who was not in uniform, approached the men. He did not announce that he was a police officer. Instead, when asked during the hearing, "Did you identify yourself?”, he answered "yes”; when asked, "How did you do that?”, he answered, "My shield was displayed outside my coat.”
Upon reaching the defendant, the following occurred in rapid succession. He immediately asked the defendant what was going on. While asking this question he saw a bulge inside of the defendant’s jacket and he "spontaneously” reached to grab the defendant. However, the other male pushed the officer. The defendant then ran and Officer Green-berg chased and tackled him in the street. The officer reached into defendant’s jacket and removed a brown paper bag. The defendant attempted to take the bag and the drugs fell from the bag. The defendant was then arrested.
Also, Officer Greenberg testified that cabdrivers generally would give some distress signal or would commit a traffic infraction to attract the police if a crime is being or is about to be committed against them. For example, they would deliberately run a "red light” or would flash their headlights. In this case none of the cabdrivers did anything that would indicate that any of them were in fear that a robbery or any other crime was being attempted or being committed against anyone.
Lastly, when asked whether he was aware of the problems African Americans have getting yellow cabs, he responded that this was a "gypsy cab”, and that he had never seen a "gypsy cab” reject anyone.
*835 Police Officer Mario Toro was assigned as the arresting officer in this case. The officer transported the defendant to the precinct and while taking pedigree information the defendant stated "it [the drugs] was not his, 'it was planted on him. He’s never been arrested and that he doesn’t live around here’ ”. At the time defendant made this statement, Miranda warnings had not been given. The statement was not a response to any question.
DISCUSSION
The question before this court is whether the police officer’s observations of the defendant permitted the officer to interfere with the defendant to the extent necessary to gain explanatory information.
First, the officer approached the defendant because he suspected that the defendant was attempting to rob a taxicab driver. He found the defendant’s actions suspicious, and indicative of an attempted robbery. However, the actions he described were the typical actions of a person hailing a cab. Officer Greenberg observed the defendant and a companion at an intersection hailing a taxicab. Three cabs stopped, within a minute or two, and after a short conversation with each driver, each cab drove away. Nothing else occurred. None of the cabs drove away at an unusual rate of speed. None of the familiar distress signals, flashing lights, going through red lights, etc., were made by any of the cabdrivers. None of the cabdrivers cried out for help. No report of any attempted robbery of a cabdriver was transmitted to or received by the officer. No indication of a dispute or confrontation was observed. In fact, the officer did not hear any of the very brief conversations between the defendant and each driver. In sum, there was nothing to alert the police that criminal activity was afoot or that anyone was in need of police assistance.
Given these facts, this court concludes that the officer was acting on a "hunch”. There were no objective factors which could lead an "ordinarily prudent and cautious person under the circumstances to believe that criminal activity [was] at hand.” (People v Howard, 147 AD2d 177, 179 [1989].) He had an intuitive feeling that something was wrong. This conclusion is borne out by the following questions to Officer Green-berg and his answers:
"Q. Do you recall what space of time had elapsed from the *836 time the first cab came stopped and left until the time the last cab came and left?
"A. Maybe a minute or two.
"Q. Now, based on your experience, did you draw any conclusion related to the meaning of the cab pulling off in that fashion?
"A. We thought that perhaps the male wanted the cab driver to go to a location that he was uncomfortable with, maybe an isolated area or something like that. So, we went over to find out what was going on.
"Q. And what led you to believe that that might be so?
"A. Most of the cab robberies that I’ve investigated have occurred in isolated areas.
"Q. So, was it your belief that there was a possibility that the defendant wished to engage in a cab robbery?
"A. Yes.”
Reasonable suspicion must be based on more than a feeling as to "perhaps” what the defendant and/or the cabdriver were thinking or what either "wished” to do or not do. " 'Reasonable suspicion’ has been defined as the quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe that criminal activity is at hand. (People v Sobotker, 43 NY2d 559 [1978]; People v Cantor, 36 NY2d 106 [1975].) 'The requisite knowledge must be more than subjective; it should have at least some demonstrable roots. Mere "hunch” or "gut reaction” will not do’. (People v Sobotker, supra, at 564.) Nor will innocuous behavior alone generate a founded or reasonable suspicion that a crime is at hand. (People v De Bour, supra, at 216.)” (People v Howard, supra, at 179.)
Moreover, the officer was aware that it is not unusual for African American males to have great difficulties in getting cabs in New York City because of their race. When asked about this fact, he testified that in his experience a gypsy cab never refused to take anyone, even though he never heard what transpired between the defendant and any of the cabdrivers. The difficulty which African American males have in getting cabs, to provide services to them, is well known. That African Americans are denied services from cabs is a vestige of racial stereotyping which victimizes African Americans of all social and economic levels and persists to this very day. (See, West, Race Matters, at x [Beacon Press, Boston 1993].) It seems ironic that not only must this indignity be suffered on a *837 daily basis but that this fact can become the basis for suspicion of criminal activity by the victim of this denial of a public accommodation. This sad fact supports a conclusion that there was nothing unusual about this sequence of three cabs not taking the defendant and his companion, both of whom are African Americans, and it attests to the innocuous nature of the defendant’s behavior.
We are all aware that crimes against cabdrivers appear to be increasing in number and in seriousness. Police must exercise vigilance to prevent these crimes. However, as stated in People v Madera (189 AD2d 462, 467, affd 82 NY2d 775 [1993]): "The very basic right of an individual to remain free of governmental intrusion and coercion would amount to very little if the police were permitted to stop, detain and question someone simply because they had some justifiable desire for additional information.”
In this case, the officer’s suspicion that "criminal activity was afoot”, based on the defendant’s action of hailing a cab, was not based on an objective criteria. His suspicion of the "possibility” of criminality in the defendant’s actions was based on sheer speculation. He had a "hunch”. A "hunch” is not a reasonable suspicion. His stop and seizure of the defendant under these circumstances was constitutionally impermissible.
Second, even if the officer’s approach and question to the defendant was constitutionally permissible as a request for information (People v De Bour, 40 NY2d 210 [1976], supra), his attempt to grab the defendant to conduct a frisk, based on the officer’s observation of an "undefined” bulge, was not. Moreover, the officer’s pursuit was similarly not permissible.
When Officer Greenberg approached the defendant he observed an undefined large nonwaistband bulge under the defendant’s jacket. Believing that this bulge might be a gun, the officer immediately attempted to grab the defendant to conduct a frisk. The defendant’s companion pushed the officer and the defendant ran.
The bulge did not appear to be the outline of a gun. It was not in the waistband area, which is recognized as the area where guns are usually carried. There was no evidence that the defendant made any gesture or movements that would suggest that the bulge was a weapon. The Court of Appeals has repeatedly held that "a pocket bulge, unlike a waistband bulge, 'could be caused by any number of innocuous objects’ *838 (People v De Bour, [supra, at 221])” (People v Holmes, 81 NY2d 1056 [1993]). This principle applies with equal force to undefined bulges in other nonwaistband areas.
Moreover, pursuant to CPL 140.50 (3), a frisk may only be conducted when a police officer "reasonably suspects that he is in danger of physical injury”. Here, there was no indication by the officer that he or his sergeant feared for their safety.
As to the defendant’s pursuit, it was only permissible on a founded suspicion of criminality. A police pursuit of an individual "significantly impede[s]” the person’s freedom of movement and thus must be justified by reasonable suspicion that a crime has been, is being, or is about to be committed. (People v Holmes, supra, 81 NY2d, at 1057-1058, citing People v Martinez, 80 NY2d 444, 447 [1992].) The Court of Appeals has repeatedly held that "[f]light alone, however, or even in conjunction with equivocal circumstances that might justify a police request for information (see, People v Hollman, 79 NY2d 181, 190; People v De Bour, 40 NY2d 210, 218-220), is insufficient to justify pursuit because an individual has a right 'to be let alone’ and refuse to respond to police inquiry (see, People v May, 81 NY2d 725, 727-728).” (People v Holmes, supra, at 1058.) The bulge in the defendant’s jacket was equivocal in nature and could have been caused by "any number of innocuous objects.” Given all the surrounding circumstances, this pursuit was not permissible.
Lastly, the defendant’s companion pushed the officer. However, there was no indication from the officer that this action was of significance, with respect to his forcible stop of the defendant. When the officer approached the defendant, he immediately reached out to grab the defendant after uttering a few words. The officer was not in uniform. Although his badge was out, there is no indication as to whether it was in a location which was clearly visible. The officer never uttered words usually recognized as an official police directive to the public, like "police, stop!”, nor did he ask about the bulge under the jacket. Finally, there is no indication that the companion’s action was viewed as an attack on the officer.
Similar to the defendant’s flight, his companion’s "push” was a direct and spontaneous response to an unexpected confrontation with the officer. This action was not "an independent act involving a calculated risk”, instigated or directed by the defendant, to prevent the officer from performing his official duties. Consequently, this act did not dissipate the *839 taint of the initial impermissible stop of the defendant. Similar to the conclusion in People v Felton (78 NY2d 1063, 1065 [1992]), the defendant’s companion’s action in pushing the officer "was 'immediate, spontaneous, and proportionate to the officer’s attempt to lay hands on him’ [the defendant] * * * and * * * not sufficient to attenuate the unlawful stop so as to render the arrest and seizure of contraband lawful (see, People v Wilkerson, 64 NY2d 749).”
Since the defendant’s statement to Officer Toro flows directly from his illegal stop and seizure by the police, such statement constitutes the "fruit[s] of the poisonous tree” (Wong Sun v United States, 371 US 471, 487 [1963]). As such, the statement must also be suppressed.
Consequently, defendant’s motion to suppress the physical evidence and the statement is granted.