OPINION OF THE COURT
Robert L. Cohen, J.
The defendant, April Pope, is charged with the crimes of *509 criminal possession of a forged instrument in the second degree (Penal Law § 170.25), and aggravated unlicensed operation of a motor vehicle in the second and third degrees (Vehicle and Traffic Law § 511 [2] [a] [iv]; [1] [a]). She has moved to suppress an allegedly forged New York State driver’s license taken from her when her automobile was stopped at a police checkpoint on a residential street, at the corner of West 174th Street and Grand Avenue, in the Bronx. In addition, she has moved to suppress a statement she made to a police officer during the course of that stop.
At a combined Mapp/Huntley hearing the People called Police Officer Michael Feltham and Sergeant Mary Lennox-Craig. The defense did not call any witnesses.
The People’s evidence is undisputed and the sole question for the court to decide is one of constitutional dimension which, to my knowledge, has not been decided by our learned appellate courts in New York since the United States Supreme Court’s decision in City of Indianapolis v Edmond (531 US 32; cf. Matter of Muhammad F., 94 NY2d 136; People v Scott, 63 NY2d 518; People v John BB., 56 NY2d 482; People v Jackson, 285 AD2d 416; People v Mirin, 280 AD2d 495).
For the reasons hereinafter set forth, the court finds that the checkpoint stop of defendant’s automobile was unconstitutional, despite its nondiscretionary implementation pursuant to “Written [New York City Police Department] Checkpoint Guidelines”[1] because its primary purpose was to advance “ ‘the general interest in crime control’ ” (Indianapolis at 44, quoting Delaware v Prouse, 440 US 648, 659 n 18).
The Hearing
Police Officer Michael Feltham, a 21/2-year veteran of the police force, testified that on June 28, 2000 he was on duty at the checkpoint post of the “Model Block Project” at the corner of West 174th Street and Grand Avenue. He had been assigned to the Model Block Project for approximately two weeks. Ac *510 cording to Officer Feltham, as part of the Model Block Project they were stopping every car coming onto the block.
The defendant April Pope was driving her car and approached the checkpoint. Officer Feltham stopped the defendant’s car at the checkpoint and explained to her that due to the Model Block Project, every individual attempting to drive onto the block has to either live on the block, have business on the block, or be visiting family on the block in order to drive a car through the block. The officer then asked the defendant for a license, registration and proof of insurance.
Upon viewing defendant’s license, Officer Feltham became suspicious as to its authenticity[2] and ran the license through a computer. The license was not found. Officer Feltham approached the defendant and asked “Is this a fake ID?” The defendant said “Yes.” Officer Feltham asked the defendant why she had a fake ID and she replied that her license was suspended. After reporting these events to his Sergeant, Officer Feltham placed the defendant under arrest.
According to Officer Feltham, the Model Block Project was designed to “clean up Davidson Avenue and get the drug dealers off the street and prostitutes off the streets and gangs off the street * * As part of the Model Block Project there were approximately 10 officers on the block at all times, 24 hours per day. Vehicle checkpoints were done at the corner of West 174th and Grand Avenue for every car attempting to enter Davidson Avenue.[3] An individual in a car attempting to enter Davidson Avenue had to show identification and have a valid reason to enter the street.
At the checkpoint at West 174th and Grand Avenue, approximately four to five wooden barriers were placed preventing access by automobiles to Davidson Avenue without passing through the checkpoint. The checkpoint was visible from a distance and motorists could avoid the checkpoint before approaching it.
Officer Feltham testified that all officers manning the checkpoint were given a pamphlet containing the guidelines on how they were to conduct themselves, which they were ordered *511 to carry at all times. Officers were given no discretion as to which cars were stopped — all cars were stopped. Copies of these guidelines regarding vehicle and pedestrian interactions were introduced into evidence as People’s exhibit 1. A map of the area of the Model Block Project was introduced into evidence as People’s exhibit 2.
Sergeant Mary Lennox-Craig, an 18-year veteran of the police force, testified that she was currently assigned to the 46th Precinct Model Block Project; she coordinates the staffing of the project and supervises the officers. However she was not assigned to the Model Block Project on June 28, 2000, as she was on patrol that day.
According to Sergeant Lennox-Craig, the 46th Precinct Model Block Project on Davidson Avenue began on June 21, 2000. Davidson Avenue was targeted because it was a high crime and high narcotics area. Sergeant Craig testified that the Model Block Program is a nationwide program that targets neighborhoods with high incidence of violence or drug problems. For a year prior to June 21, 2000, police narcotics and police gang units went onto the block to arrest drug dealers and people with outstanding warrants. In the first quarter of 2000, 118 arrests were made on that block.
According to the Sergeant, once the Model Block Project is initiated, it lasts from two to four years. The project includes car stops, pedestrian stops and block patrols on foot. Vertical sweeps of all buildings are done and rooftops are checked. Ten officers are assigned to each tour; two to four officers man the checkpoint. All officers are given written guidelines on how to conduct the checkpoint, and they are instructed to carry these guidelines at all times. All vehicles approaching the checkpoint are to be stopped to determine whether the occupants have a reason to be on the block. The Model Block Project was advertised to the public through radio commercials, TV commercials, posters and in newspapers all over the city.
Crime statistics for the first quarter of 2000 were introduced into evidence as People’s exhibit 3, in a report from the commanding officer of the 46th Precinct to the deputy commissioner for operations. The statistics indicated that during this time period there were eight robberies, two felony assaults and one grand larceny auto, which Sergeant Lennox-Craig testified were high for a two-block area. The report talked about narcotic and other arrests, numbers of radio runs, quality of life arrests *512 and complaints and the concerns of the community and the precinct commander regarding the programs.[4]
Another report entitled “46th Precinct Model Block” was introduced into evidence as People’s exhibit 4. This report states that Davidson Avenue between West 174th and West 176th was chosen for the Model Block Project because of “its propensity towards violent behavior.” According to the report, there were five homicides between 1996 and the time the project was initiated. The report goes on to explain that criminal activity on the block includes drug sales, auto stripping and quality of life issues such as drinking in public, disorderly groups, loud music, and loitering for prostitution or drug use. According to this exhibit, vehicles can only reach Davidson Avenue via West 174th and Grand Avenue. Pedestrians can enter Davidson Avenue via West 174th, West 176th and three sets of stairs on the block.[5] Checkpoints were established at all these pedestrian entrances. Exhibit 4 states that Davidson Avenue is a residential block with seven private homes, 12 tenements, one church, one daycare center, and one small grocery store.
People’s exhibit 5 is a report from the executive officer of the 46th Precinct to “all supervisors” stating that the Model Block Project began on June 21, 2000 and that the guidelines were to be followed at all times. These guidelines include the directive that barriers must be kept in place at all times and that all officers assigned to the project must carry checkpoint guidelines at all times.
People’s exhibit 7, a report dated June 18, 2000 from the commanding officer of West Bronx Narcotics Initiative concerning the Model Block Project, was introduced into evidence. This report stated that 42 arrests were made by the command during the course of the operation.
The People introduced evidence of crime statistics in the targeted area, which covered more than a two-block residential area extending between West 176th Street to Featherbed Lane, on Davidson Avenue. However, no empirical evidence was submitted indicating the effectiveness of the vehicle checkpoint aspect of the Model Block Project, from the time it first began *513 in June 2000, until the hearing, approximately 17 months later, i.e., whether it had any measurable impact on the crime rate on Davidson Avenue.
Arguments of Counsel
Defendant argues that the checkpoint stop violated her right to be free from unreasonable searches and seizures under both the New York State Constitution and the Federal Constitution. Counsel claims that the purpose of the checkpoint was to prevent criminal activity on Davidson Avenue, and based upon the United States Supreme Court’s holding in City of Indianapolis v Edmond (supra, 531 US 32), a checkpoint that has as its purpose general crime control violates the Fourth Amendment of the United States Constitution, and violates the right of those stopped to be free of unreasonable searches and seizures, since there is no individualized suspicion required as a predicate for the stop. Counsel further argues that this checkpoint was particularly egregious since it was maintained on a residential street and prevented both pedestrians and automobiles from coming and going freely in a residential neighborhood. During argument counsel asked the court to take judicial notice, based upon the CJA form contained in the court file, that at the time of her arrest defendant was a resident of Davidson Avenue, and therefore in order to get to her home she had to pass through the checkpoint.
Regarding the oral statement, defense counsel argues that after Officer Feltham took defendant’s license, she was not free to leave; she was in custody. When Officer Feltham returned and questioned her, it was an interrogation without benefit of Miranda warnings and thus the statement must be suppressed. In addition counsel argues that the arrest was unlawful and that therefore the seizure of the license and the statement must both be suppressed as fruit of the poisonous tree.
The People argue that the purpose of the checkpoint is not to check for criminal activity, but to limit traffic in the area which in turn would address the high crime rate on Davidson Avenue. The checkpoint was run within constitutional guidelines in that it was motivated by the public concern for crime in the area, it was authorized by written guidelines which were required to be carried by the officers at all times, that there was no discretion exercised by the officers in deciding which cars to stop, and it was visible from a distance and could be avoided by those not wishing to pass through it. They further argue that the checkpoint was an effective means of limiting *514 traffic in the area and that it was not a pretext for arresting people committing ordinary crimes.
Regarding defendant’s statement, the People argue that at the time defendant made the statement she was not in custody, and therefore Miranda warnings were not required. The defendant was not interrogated, and the statement was voluntarily made. Accordingly, it should be admissible at trial.
Discussion
It is undisputed that Ms. Pope’s car was subject to a suspicionless seizure, and unless reasonable, violated the Fourth Amendment’s proscription against unreasonable searches and seizures (see Indianapolis, supra at 36).
In Indianapolis the Supreme Court considered the constitutionality “of a highway checkpoint program whose primary purpose is the discovery and interdiction of illegal narcotics.” (Id. at 34.) In holding the Indianapolis nondiscretionary checkpoint program unconstitutional, the Court stated:
“We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion. We suggested in Prouse that we would not credit the ‘general interest in crime control’ as justification for a regime of suspicionless stops. 440 U.S., at 659, n.18, 99 S.Ct. 1391. Consistent with this suggestion, each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety. Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment.” (City of Indianapolis v Edmond, supra at 41-42; see also, Michigan Dept. of State Police v Sitz, 496 US 444; United States v Martinez-Fuerte, 428 US 543.)
At bar, the People argue that the checkpoint of motorists at West 174th and Grand Avenue was not to check for criminal wrongdoing, but to limit vehicular access to Davidson Avenue, which in turn would reduce the crime rate in that residential neighborhood. Although laudable in purpose, the checkpoint *515 program at issue is ultimately for the purpose of crime control on Davidson Avenue (see petitioners’ árguments in Indianapolis at 42-43), and does not meet the limited exceptions set forth in Indianapolis.
Firstly, the record is devoid of any evidence of the effectiveness of the vehicle checkpoint program, over a 17-month period, on the crime rate on Davidson Avenue.
Secondly, its deterrent value is highly questionable, and perhaps nil. A motorist or occupant who lives on the block or is visiting someone on the block, pursuant to the guidelines, must be given access to Davidson Avenue despite, hypothetically, contraband secreted in the car or on the person. Moreover, as previously noted, pursuant to the guidelines, a pedestrian with criminal intent may refuse to answer questions and/or refuse to give his or her identification. In the absence of reasonable suspicion of criminal conduct on the part of the pedestrian, the pedestrian must be given access to the block.
Most importantly, the checkpoint program, according to Sergeant Lennox-Craig, lasts for two to four years and is in operation 24 hours a day. The impact of this program upon all citizens in this neighborhood is egregious, and violates the Fourth Amendment.
It was poignantly noted in Delaware v Prouse (supra, 440 US 648, 662-663) that:
“An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one’s home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the street. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed.”
Similarly, the guarantees of the Fourth Amendment should not be circumscribed because a resident happens to live in a high crime area (see People v Howard, 147 AD2d 177, 181).
*516 Conclusion
Accordingly, I find the checkpoint program at bar indistinguishable in purpose — general crime control on Davidson Avenue — from the checkpoint program declared unconstitutional in Indianapolis, and, therefore, grant defendant Pope’s motion to suppress the alleged forged license and her statements as the direct consequence of the unlawful stop of her vehicle (see Wong Sun v United States, 371 US 471; Dunaway v New York, 442 US 200).

. See, People’s exhibit 1, “block checkpoint guidelines vehicle stops” (at 1). People’s exhibit 1 (at 2) is captioned block checkpoint guidelines pedestrian interaction. According to the guidelines, checkpoint car stops are treated differently than pedestrian stops. Regarding the latter, a pedestrian “should not” be required to produce identification and may choose not to answer any questions in the absence of reasonable suspicion (emphasis in original). Whereas all motorists must produce a license and registration and must answer questions to gain access to Davidson Avenue. (See People’s exhibit 1, at 1-2.)

. Upon viewing the license Officer Feltham noticed that the date of birth listed made the bearer under 21 years of age. The license should have reflected this on its face, but it didn’t. In addition, Officer Feltham testified that the picture was blurry and the texture appeared smooth, as if laminated.

. Davidson Avenue is a two-block, one-way street with northbound vehicular traffic. Vehicles can only reach Davidson Avenue via West 174th and Grand Avenue.

. “The concerns of the community involved several areas. One area would be restrictions or violations of their constitutional rights by the personnel assigned to the Model Block.” (See People’s exhibit 3, at 2, para 2.)

. As previously noted (see n 1, at 509), pedestrians may not be denied access to Davidson Avenue, in the absence of reasonable suspicion of criminal activity, even if they do not provide identification or refuse to answer a police officer’s questions.