OPINION OF THE COURT
Robert I. Caloras, J.
By petition, filed on July 21, 2016, respondent is charged with acts which, if committed by an adult, would constitute the crime of criminal possession of a weapon in the second degree, in violation of Penal Law § 265.03 (1) (b), criminal possession of a weapon in the second degree, in violation of Penal Law § 265.03 (3), criminal possession of a firearm, in violation of *593 Penal Law § 265.01-b, criminal possession of a weapon in the fourth degree, in violation of Penal Law § 265.01 (1), unlawful possession of a weapon by a person under 16, in violation of Penal Law § 265.05 (two counts), and possession of a pistol or revolver ammunition, in violation of Administrative Code of the City of New York § 10-131 (i) (3). Respondent filed a motion requesting, inter alia, suppression of a .22 caliber semiautomatic firearm containing a magazine loaded with eight bullets, three baggies each containing marijuana, and one metal grinder/drug paraphernalia, pursuant to Family Court Act § 330.2, CPL 710.20 and 710.60. In a decision, dated September 9, 2016, this court granted the suppression motion to the extent a Dunaway/Mapp hearing was to be conducted. The hearing was held on October 14 and 21, 2016, and was adjourned to October 28, 2016 for the parties to submit memoranda of law. Both sides did so. The court grants the motion to suppress physical evidence for the following reasons:
Findings of Fact
At the suppression hearing, the presentment agency’s witness Sergeant (Sgt.) Matthew Barber stated that he had been a sergeant for almost three years, and prior to this, a police officer for five years with the New York City Police Department (NYPD). He had made approximately 15 arrests involving firearms, and at least half of them involved observing firearms under concealed clothing.
On July 17, 2016, Sgt. Barber was assigned to the 101st Precinct, and at about 11:25 p.m., he was with Police Officer (P.O.) Michael McCarthy and P.O. Francis Devlin in an unmarked vehicle on routine patrol, traveling at 10 to 20 miles per hour, on Beach 15th Street, in Queens County. The three were in uniform, and P.O. McCarthy was driving, Sgt. Barber was seated in the front passenger’s seat, and P.O. Devlin was seated in the back. Sgt. Barber testified that they were patrolling this area because it was generally known as a crime prone location for shootings, robberies, and violent crime. That night the weather was clear, and it was dark out with streetlights and house lights illuminating Beach 15th Street. At that time, Sgt. Barber observed two males come out from between two parked cars, and walk together in the street. P.O. McCarthy drove behind these individuals, identifying one of them as A.M., known to Sgt. Barber from prior arrests in the Precinct and an outstanding warrant that P.O. McCarthy had previously informed him of. As P.O. McCarthy drove up next to the two individuals, Sgt. Barber leaned over him and saw that as the *594 other individual moved his left foot forward, the material of his pants would rest around a rectangular bulge, three to four inches in length and one inch in width, in his front left pocket. Sgt. Barber believed the bulge to be the barrel of a firearm. In court, Sgt. Barber identified respondent as the other individual.
P.O. McCarthy then said “Hey, hold up,” and exited the vehicle and approached A.M. Sgt. Barber also exited the vehicle to assist P.O. McCarthy and stop the respondent because respondent was too close to P.O. McCarthy. As he approached, Sgt. Barber’s concern that respondent had a gun in his pocket was increased when he saw that respondent’s left pocket was weighted down further than his right side. Sgt. Barber then told respondent “pop your hands up,” and respondent complied. Sgt. Barber then tapped the bottom of respondent’s left pocket and felt a metal object and asked what the object was. Respondent said nothing. Sgt. Barber explained that the metal object felt cylindrical in shape and he thought it was the barrel of a firearm. Although respondent stated “[i]t’s just weed,” Sgt. Barber reached into his pocket and recovered a bottle. Respondent then said “it’s a Nutcracker” and Sgt. Barber observed it to be “rectangular in shape, plastic, no label on it, about a quarter to halfway full,” with some weight to it. After putting the bottle down on the street, Sgt. Barber grabbed respondent’s pocket where he had felt the metal object. Respondent put his hands down, and Sgt. Barber told him to “pop them back up.” Respondent put his arms back up. Sgt. Barber felt a small cylindrical object in respondent’s pocket, and reached in to recover the object. Sgt. Barber pulled the object from respondent’s pocket and observed a marijuana crusher and green leafy items in ziplock bags, which, based upon his training, he recognized to be marijuana.
Thereafter, Sgt. Barber guided respondent toward the front of the car, and sought to control him by placing his arm around respondent’s waist. Thereupon, Sgt. Barber felt a metal handle of a gun, handcuffed respondent, and then recovered a gun from respondent’s waistband. Sgt. Barber also testified that in his eight years as an officer with the NYPD he has stopped and searched people many times because he believed they had a concealed weapon. Sgt. Barber also testified that when he and P.O. McCarthy first observed the respondent and A.M. from behind they weren’t engaging in any criminal activity, but were just walking down a residential street. Finally, at the time A.M. was stopped, Sgt. Barber had not seen the open *595 bench warrant, and did not know what crime the outstanding warrant was issued for.
Standard of Law
At a suppression hearing the presentment agency has the burden of going forward to show the legality of the police conduct in the first instance (see People v Whitehurst, 25 NY2d 389 [1969]; People v Spann, 82 AD3d 1013 [2d Dept 2011]; People v Thomas, 291 AD2d 462 [2d Dept 2002]). “Implicit in this concept is that the testimony offered by the [presentment agency] in first presenting their case must be credible” (People v Quinones, 61 AD2d 765, 766 [1st Dept 1978], citing People v Berrios, 28 NY2d 361 [1971]). Once the presentment agency establishes the legality of the police conduct by credible evidence, the respondent bears the burden of establishing that the arrest was not based on probable cause or that the police conduct was otherwise illegal (see People v Spann; People v Thomas; Matter of Robert D., 69 AD3d 714 [2d Dept 2010]).
The Court of Appeals has identified in People v De Bour (40 NY2d 210 [1976]) a graduated four-level test to determine the propriety of police encounters. The first level permits a police officer to request information from a person, and merely requires that the request be supported by an objective, credible reason, not necessarily indicative of criminality. The second level, the common-law right of inquiry, permits a somewhat greater intrusion and requires a founded suspicion that criminal activity is afoot. The third level authorizes an officer to forcibly stop and detain an individual, and requires a reasonable suspicion that the particular individual was involved in a felony or misdemeanor. The fourth level provides that an officer may arrest a person when he has probable cause to believe that the person to be arrested has committed a crime (People v Moore, 6 NY3d 496 [2006], citing De Bour; see also People v Hollman, 79 NY2d 181 [1992]).
In the instant matter, the court credits the testimony of Sgt. Barber, and finds that the facts and circumstances establish that Sgt. Barber had an objective credible reason to approach the respondent and inquire. A level one inquiry allows an officer to approach an individual and inquire about basic, nonthreatening matters such as name, address and destination (see People v Garcia, 20 NY3d 317 [2012]). This first level is known as a “request for information.” The police must have an articulable reason for the questioning, but the reason need not be indicative of criminality (see People v *596 Hollman at 184). Here, Sgt. Barber’s observations provided him with a legal basis to approach respondent and make a level one request for information (see People v Owens, 127 AD3d 788 [2d Bept 2015], lv denied 25 NY3d 1169 [2015]). However, with no additional information, P.O. McCarthy ordered A.M. and respondent to stop and Sgt. Barber observed that respondent’s left pocket appeared to be weighted down further than his right side, where Sgt. Barber had previously observed a bulge. Sgt. Barber approached the respondent from behind, and directed him to “pop up your hands” and tapped the bottom of respondent’s pocket. This intrusion was a level three stop and required reasonable suspicion.
The presentment agency argues that based upon the totality of the circumstances, Sgt. Barber had a level three reasonable suspicion, which permitted him to forcibly stop, detain, and frisk respondent by tapping respondent’s pocket. The court disagrees, and finds that the presentment agency has not sustained its burden to establish that the conduct of the police was justified in its inception, or reasonably related in scope to the circumstances which rendered its inception permissible (see People v Howard, 147 AD2d 177 [1st Dept 1989], lv dismissed 74 NY2d 943 [1989]). In order to justify the frisk, the alleged fear or apprehension Sgt. Barber felt must have been reasonable under the circumstances. This requires setting forth objective factors which could reasonably be interpreted to warrant such apprehension or fear when Sgt. Barber detained and approached respondent (see People v Howard).
At the time of the stop the police were not responding to a report of crime in the area. It was nighttime, in an area known for violent crime and shootings, respondent was with A.M. who had an active bench warrant and a known criminal history, and Sgt. Barber had observed a heavy bulge in respondent’s pocket, the outline of which led him to believe was the barrel of a gun. Sgt. Barber also testified that after exiting the unmarked vehicle, he observed respondent was too close to P.O. McCarthy and feared for P.O. McCarthy’s safety. Prior to instructing respondent to pop his hands up and tapping respondent’s pocket, Sgt. Barber testified that neither he, nor any of the other officers on the scene, said anything to respondent. There was no testimony that respondent moved in any way to cause Sgt. Barber to recognize from his training and experience as typical of attempts to adjust a waistband. Nor did *597 respondent try to evade the police encounter, or make any furtive, threatening or menacing gestures which would indicate that criminal activity was afoot. Throughout the encounter respondent was compliant, and did not engage in any behavior or act that would give rise to a greater level of inquiry. At all times, respondent’s actions were innocuous and readily susceptible of an innocent interpretation (People v De Bour at 216; see People v Fletcher, 130 AD3d 1063 [2d Dept 2015], lv granted 26 NY3d 1044 [2015]; People v Howard; People v Silvestre, 119 AD2d 601 [2d Dept 1986]; see also People v Moore, 176 AD2d 297 [2d Dept 1991]), and, as such, does not establish a founded suspicion or reasonable suspicion of criminality. The court finds that upon these facts and circumstances, Sgt. Barber failed to conduct a meaningful inquiry sufficient to establish a level two common-law inquiry, and lacked reasonable suspicion to believe that the respondent posed a threat to his or P.O. McCarthy’s safety when he tapped respondent’s pocket (see People v Harris).
Moreover, it has been consistently held that “the mere observation of an undefinable bulge in a person’s pocket is insufficient as a basis for a frisk or search for a [gun]” (People v Howard, 147 AD2d at 181; People v Williams, 160 AD2d 397 [1st Dept 1990]). The court takes judicial notice that pockets are for putting things in and waistbands are for holding pants up. Pockets are made for carrying things, and may be weighed down by any number of things commonly stored in a pocket, such as a wallet or a cellular phone. This difference is acknowledged in the case law, where an increased level of suspicion is awarded to an item resembling a gun in a waistband (People v Davenport, 92 AD3d 689 [2d Dept 2012], lv dismissed 19 NY3d 959 [2012]). Unlike a waistband bulge which is a telltale sign of a weapon, a rectangular item in a pocket is not unexpected, and can not be awarded an increased level of suspicion without more (see People v Howard). Here, Sgt. Barber’s testimony about the unidentifiable bulge in respondent’s pocket was readily susceptible of an innocent as well as a guilty explanation, and was not a sufficient basis to justify a pat-down search of respondent’s pocket (see People v Harris).
The court also notes that the respondent may not be stopped and frisked solely because he was in the presence of A.M., whom P.O. McCarthy and Sgt. Barber knew to have an outstanding bench warrant (see People v Dean, 73 AD3d 801 *598 [2d Dept 2010]). Nor was reasonable suspicion created due to respondent being with A.M. Significantly, there was no indication that A.M.’s outstanding warrant involved a gun. It is well settled that guilt by association is not a permissible basis to support a finding of reasonable suspicion, and respondent’s proximity to A.M. cannot provide a basis for Sgt. Barber to stop, detain and frisk him (see People v Ballejo, 114 AD2d 902 [2d Dept 1985]).The court acknowledges the difficulties law enforcement face in these street encounters. However, the court also recognizes its obligation “to be ever vigilant to insure that such considerations do not overwhelm the constitutional bulwarks which have historically insured one’s right to be secure against unreasonable and unjustifiable governmental intrusions upon one’s privacy” (see People v Howard, 147 AD2d at 182). In determining the legitimacy of any police encounter, the court is obligated to weigh the governmental and societal interest in detecting and deterring crime and the safety of law enforcement agents, against an individual’s right to privacy and to be secure in his/her person and belongings. Reasonableness is the key principle in this analysis of balancing interests. In fact, this court suggests it is not reasonable to suppress evidence recovered when a police officer has a level of suspicion and acts in a way that requires one level of suspicion higher. For example, if a police officer has a level one right to inquire of an individual, and poses pointed questions at that individual, which requires a level two common-law right of inquiry based upon a founded suspicion that criminal activity is afoot, then any property recovered from this violation shouldn’t be suppressed. It is not reasonable to expect police in a street encounter to act as if they are a living embodiment of a legal treatise, brief, or decision. Furthermore, a one-level violation does not offend due process, or an individual’s liberty, in a way that outweighs the governmental and societal interest. However, a two-level violation would outweigh the governmental and societal interest, and require suppression.
Accordingly, under the totality of the circumstances Sgt. Barber was not justified in patting respondent’s pocket bulge as a minimally intrusive protective measure. Under these circumstances, the branches of respondent’s motion which seek to suppress physical evidence are granted.